[No. S056981. July 17, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
NANETTE SCHEID, Defendant and Appellant.

4

COUNSEL

Gregory Marshall, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, M. Howard Wayne, Laura Whitcomb Halgren, Garrett Beaumont and Carl H. Horst, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—In 1994, defendant Nanette Scheid was convicted of one count of first degree murder, two counts of robbery, and one count of burglary. (Pen. Code, §§ 187, 211, 459.)[1] A divided Court of Appeal reversed the convictions, concluding that the trial court erred in admitting into evidence a single photograph of the murder scene, and that the erroneous admission of this photograph was sufficiently prejudicial to require reversal.

As we shall explain, we conclude the Court of Appeal erred in finding the admission of the photograph to have been improper, and further conclude that, in any event, the admission of this evidence was not prejudicial. Accordingly, we reverse the judgment of the Court of Appeal.

### I.

### A.

The present appeal is from a conviction after retrial. In 1992, a jury convicted defendant of one count of first degree murder, two counts of robbery, and one count of burglary. The trial court sentenced defendant to an indeterminate term of imprisonment of 26 years to life. In 1993, the Court of Appeal reversed the judgment on the ground the trial court improperly had denied defendant's motion to be tried separately from her codefendants.[2]

In 1994, on retrial, a jury again convicted defendant of one count of first degree murder, two counts of robbery, and one count of burglary. The trial court sentenced defendant to a determinate term of seven years and four months, in addition to an indeterminate term of imprisonment of twenty-five years to life. In 1996, a divided Court of Appeal reversed the judgment, on the ground that the trial court improperly had permitted the prosecution to

---

[1]Unless otherwise specified, subsequent statutory references are to the Penal Code.

[2]At her first trial, defendant was tried jointly with Robert Taylor and Norman DeWitt. Taylor and DeWitt were tried as capital defendants, but special circumstance allegations were not charged against defendant, and (unlike the other two defendants) she was not charged with the attempted murder of Kazumi Hanano.

Taylor and DeWitt each were convicted of one count of murder, one count of attempted murder, two counts of robbery, and one count of burglary, and the jury found true the special circumstance allegations that the murder was committed while those defendants were engaged in the commission of a robbery (§ 190.2, subd. (a)(17)(A)) and a burglary (§ 190.2, subd. (a)(17)(G)).

Following the penalty phase of the trial, Taylor was sentenced to death and DeWitt was sentenced to serve a term of life imprisonment without the possibility of parole. Taylor's automatic appeal is pending before this court. The Court of Appeal affirmed the judgment as to DeWitt. Because the present case involves defendant alone, we express no views as to any claims that have been, or in the future may be, raised by Taylor and DeWitt.

introduce an irrelevant and prejudicial photograph depicting the murder scene. We shall set forth the facts as disclosed by the evidence admitted at the second trial.

## B.

The prosecution presented the following evidence. During the summer of 1988, Kazumi Hanano advertised his 1984 black Chevrolet Corvette for sale. (To avoid confusion, we occasionally shall refer to members of the victims' family by their first names only.) In early July of that year, defendant contacted Kazumi by telephone to inquire about the car, calling him again on July 10 to obtain directions to his home, and appearing later that day at the Hananos' residence in Anaheim. Defendant informed Kazumi that her boyfriend had received an insurance settlement and planned to use the proceeds to purchase a Corvette for her. After taking a brief test drive, defendant called her boyfriend, Robert Taylor, who spoke briefly with Kazumi, inquiring whether he had the certificate of ownership, commonly known as the "pink slip." Defendant told Kazumi that the Corvette, which had been driven only about 3,000 miles in the 4 years Kazumi had owned it, was "exactly the type of car she wanted." She departed from the residence, promising to return with Taylor.

At approximately 8:15 p.m. on July 10, defendant returned to the Hananos' residence, accompanied by Taylor and Norman DeWitt, who Kazumi recalled "looked like they were Hell's Angels." Kazumi testified that he doubted that he would have let Taylor and DeWitt into his home had they arrived without defendant. Defendant carried a briefcase into the residence. While Kazumi accompanied Taylor on a test drive, defendant and DeWitt waited at the residence with Kazumi's wife, Ryoko. When Taylor and Kazumi returned, they negotiated the sale of the vehicle. Taylor requested that the bill of sale be made out to "Willis Brown," for a "red" car, in the amount of $1,500. As Kazumi was signing the pink slip, defendant departed from the residence and left in the vehicle in which she had arrived with Taylor and DeWitt.

Shortly after defendant departed, Taylor produced two handguns. He gave one gun to DeWitt, who produced a set of handcuffs. Taylor and DeWitt handcuffed the Hananos and ordered the couple to their bedroom, where they were made to kneel by the bed. After pulling the mattress over their heads and closing the window, Taylor shot each victim several times. Ryoko Hanano was killed; her husband Kazumi was paralyzed. Taylor took Kazumi's wallet, which contained approximately $20.

Several hours later, the victims' son returned home and found his parents kneeling by the bed where they had been shot. The Corvette was missing.

A police investigation in the ensuing few days led officers to Taylor's Sunset Beach residence, where they observed defendant coming and going in the early morning of July 13. Police officers followed Taylor later that day as he drove the victims' Corvette, and apprehended him when he exited from the vehicle. Officers found the victims' license plate, "TOY4KAZ," behind the driver's seat; the Corvette bore a different license plate, one registered to a 1987-model-year Corvette owned by a California Highway Patrol Officer. (The officer testified that on July 13, after having parked his vehicle in the Sunset Beach area the prior evening, he discovered that the vehicle's license plate was missing.) A search of Taylor's Sunset Beach residence revealed other items taken from the Hananos' residence, including the bill of sale for the Corvette (located in several pieces in the kitchen trash compactor), the pink slip, Kazumi's empty wallet, one of the handguns used in the shooting, and ammunition consistent with the rounds found at the crime scene. Buried outside a residence in Garden Grove, police officers recovered the second handgun used in the shooting.

The following day, the police arrested DeWitt at his residence in Cypress. In a search of his residence, police found a spiral notebook containing directions to the Hananos' residence. Contained within the notebook on a separate sheet of paper was a diagram of the layout of the victims' residence. The prosecution's handwriting expert opined that defendant wrote the directions, but, on cross-examination, he acknowledged that he could not attribute the diagram to anyone. A fingerprint expert identified defendant's left thumbprint on the page containing the diagram of the victims' residence. Her fingerprint also was discovered on the Hananos' telephone.

## C.

In defense, defendant testified that Taylor had duped her. She thought he intended to purchase—not steal—the Hananos' Corvette, that the vehicle was for him (not her), and that she never saw any firearms displayed at the victims' residence. She carried the briefcase into the victims' residence but believed it contained the money and documents necessary to purchase the vehicle. Taylor told her not to read the newspapers, and she knew nothing of the murder until she was arrested.

Defendant's mother and three former coworkers testified to her good character.[3]

Taylor testified that at his request a number of his girlfriends, including defendant, had made telephone calls on his behalf to inquire about Corvettes

---

[3]At the time the crimes were committed in 1988, defendant was 27 years of age and had no criminal record. She had been employed in several secretarial jobs and, in late June of 1988, left her parents' residence following an altercation with her sister. Defendant was residing in

listed for sale in various publications. He asked defendant to obtain the Hananos' address but stated that he already had obtained their address and, aided by a Thomas Guide road map, had visited the Hananos' neighborhood on a few occasions "to look over the house, the area, the street." Taylor told defendant that he intended to purchase a Corvette with the proceeds from an insurance settlement. He claimed that it was he who had drawn the diagram found in the notebook, based upon defendant's innocent description of the Hananos' residence.

Taylor also testified that defendant was unaware of the plan to steal the Corvette. The briefcase, he explained, simply was a prop to deceive defendant and the Hananos into believing that their meeting was for the purpose of consummating a legitimate business transaction. Taylor claimed that the briefcase did not contain the weapons; instead, he carried one of the handguns in his jacket and the handcuffs in a back pocket of his jeans, and DeWitt concealed the other handgun in the top of his trousers. Taylor recalled that after initial discussions with Kazumi at the victims' residence concerning the purchase of the vehicle, Taylor instructed defendant to depart, go to the store, and return to the residence located in Sunset Beach.

Taylor testified that on July 12, defendant asked him questions regarding what happened, and he replied: "Bitch don't you get the picture, you've been used. You just hit the fucking road."

### D.

In rebuttal, the prosecution introduced the testimony of two law enforcement officers who were involved in investigating the crimes committed at the Hananos' residence, and whose testimony challenged the credibility of defendant's version of the relevant events.

At the conclusion of the trial, the jury returned its verdict, convicting defendant of the charged offenses.

### II.

### A.

At a pretrial hearing, defense counsel moved to exclude a photograph of the crime scene. The photograph in question is 10 inches by 8 inches,

---

her car and at friends' homes when she met Taylor through a mutual cocaine connection. She spent the nights of July 7 through July 10 at his residence. As noted, the crimes occurred on July 10; upon defendant's arrest, however, she denied to the police that she had seen either Taylor or DeWitt after July 9.

depicting in color the victims handcuffed together. Their heads are face-down, resting on the blood-soaked box spring of their bed, their bodies sprawled on the floor. Kazumi Hanano's shirt is torn and soaked in blood. Ryoko Hanano's shirt has a large, dark bloodstain near the collar on the back. The mattress has been pulled partially off the boxspring, revealing what appear to be two bullet holes as well as a small projectile in the shape of a bullet. A person wearing a latex glove—presumably a paramedic—is partially shown at one edge of the photograph.

Defense counsel contended as follows: "The shooting in this case occurs after Ms. Scheid has left the victims' residence, and after she leaves the events occur where Mr. Taylor and Mr. DeWitt produce a set of handcuffs and lead the victims into a bedroom where they are shot. [The prosecution] intends to introduce one photograph of the victims lying on the mattress after they were shot. [¶] And we are objecting to the admission of that photograph on relevance and [Evidence Code section] 352 grounds, in that it is of no probative value in this case because Mr. Hanano, the victim who survives in this case, is going to testify to the events leading to what is depicted in that photograph. [The prosecutor] and I have reached an agreement where we are going to stipulate as to cause of death, which murder weapon was used, so there won't be a coroner com[ing] in to testify, so [the photograph] won't be relevant for that purpose . . . ."

The trial court inquired whether the defense was "going to stipulate that the actual killer did a first degree murder, a premeditated and deliberate killing?" When defense counsel responded affirmatively, and the prosecutor indicated a willingness to accept the stipulation, the trial court stated: "Before you do that though I think you need to step back a step and think about it, and then we will revisit the issue."

In support of the photograph's admissibility, the prosecutor contended: "Even if a stipulation is forthcoming . . . I believe that [the] photograph is relevant for two reasons. One, the [victims'] son is the one who finds them, Mr. Dean Hanano. Mr. Hanano is going to be testifying to the events both before he left the home when Ms. Scheid was still there, and afterward. He gave statements to the police shortly after viewing that scene, I think it is important for the jury to understand the emotional situation he was under, and sometimes words cannot do justice to the emotional state of mind that Mr. Dean Hanano was in at the time he spoke. [¶] That also goes for Mr. Hanano, the victim there makes certain statements to the police at that time regarding the commission of the offense and what happened, and I believe both of those are relevant for their credibility, and for the stress that they were under at the time. And it is the only crime scene photo of the bedroom showing the victims that I will be introducing."

Defense counsel responded: ". . . I believe it will be apparent from their testimony, Mr. Hanano will describe what occurred, and it will be apparent from his testimony that he was shot before he made any statements to the police, and he had laid in a position on the bed for some six hours prior to the police arriving and he lost a lot of blood. [¶] Dean Hanano will be able to describe the scene when he arrived in sufficient detail where the jury could take from that that he was under stress, and he did see a rather gruesome scene when he entered."

The trial court found as follows: "Well, I don't see it particularly gruesome as these cases go, neither individual is portrayed with facial photographs, in other words, they are both facedown. And the court determines under [Evidence Code section] 352 that the probative value far exceeds any prejudice to the defense, they are not particularly ghastly; the motion to exclude is denied."

The defense thereafter withdrew its offer to stipulate.

At trial, the prosecutor introduced the photograph during the direct examination of Dean Hanano, leading to the following colloquy:

"I have two additional photographs I would like to show you. Excuse me, just one, and I apologize for doing this up front. [¶] Showing you what has been marked as [People's Exhibit No.] 10-AA, do you recognize that photograph?

"Yes, I do.

"Would you please tell us who are the two people that are depicted in that photograph?

"The person on the right is my mom, and the person on the left is my dad.

"When you first saw them the upper mattress was over your father's head or both of their heads?

"It was on top of my dad's head, and my mom's head, because it was kind of off balance, my mom was a little bit lower, but it was mostly my dad's head, but they were both underneath.

"It appears your father's shirt was cut?

"Right.

"Was your father's shirt cut prior to that?

"No.

"And it was not cut when you saw it, correct?

"Right.

". . . Was there anything holding them together around their wrists?

"They were handcuffed together."

Later in the prosecution's case-in-chief, the prosecutor showed the photograph to Kazumi Hanano on direct examination, leading to the following colloquy:

"Sir, showing you what's been previously marked as 10-AA. I'd ask if you recognize that photograph, sir.

"Oh, Christ, I never saw this photograph.

"Does this photograph depict the bed in your room, sir?

"Yes.

"I apologize for showing it to you, sir. But just that's the scene of your bedroom, correct?

"Right, uh-huh."

### B.

Following defendant's conviction on retrial, she filed an appeal that raised several issues, claiming, among other contentions, that the trial court committed reversible error in admitting the photograph of the victims handcuffed together in their bedroom. Defendant contended the photograph was irrelevant in view of the prosecution's theory that, as an aider and abettor in the scheme to perpetrate a robbery, she was guilty of Ryoko Hanano's murder based upon the felony-murder rule. Defendant further contended that even if the photograph were deemed to be relevant and to have some probative value, in view of its allegedly gruesome and inflammatory nature the prejudicial effect of the photograph outweighed its probative value, and thus the trial court should have excluded this evidence. Finally, defendant contended that the erroneous admission of the photograph was prejudicial and required the reversal of the judgment.

The Court of Appeal majority agreed with defendant's position, and held: "The photograph had nothing to do with the issue in the case, i.e., whether

Scheid was a co-conspirator in a burglary-robbery or a dupe of Taylor and DeWitt. And contrary to the [trial court's] court's view, the picture *is* ghastly, depicting as it does the bloody scene of an execution and attempted murder of a handcuffed couple in their own bedroom.

"Moreover, hindsight demonstrates the prosecutor, contrary to his offer of proof, merely used the photograph to prejudice the defense case. With respect to Dean Hanano, it did nothing to aid his testimony. In fact, he testified it did *not* depict his mother and father as he found them because the mattress was still covering their heads at that time [in contrast to the photograph that showed the mattress pushed away from the victims' heads]. . . .

"With or without the defense stipulation, the photograph had exactly *no* probative value in a felony-murder prosecution when the killing occurred after the defendant left the scene. . . . The prosecutor's meager use of the exhibit with the witnesses whose testimony he said would be illustrated thereby makes rather transparent the real purpose in offering the photograph in evidence, to unfairly prejudice the jury against Scheid." (Original italics.)

Finding that the case against defendant "was marginal at best," the Court of Appeal concluded that the erroneous admission of the photograph was prejudicial under the applicable prejudicial error standard, and reversed the judgment of the trial court in order to permit a jury to determine defendant's culpability "uninfluenced by a highly inflammatory and prejudicial photograph of the execution scene." (See *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

Writing in dissent, Justice Sonenshine stated: "I agree with the majority's determination the trial court erred in admitting the photograph because it was irrelevant to any material issue in the case. (Evid. Code, § 350.) I disagree, however, with my colleagues' assessment of its prejudicial impact. I do not find the picture so gruesome as to have swayed the jury. This is particularly true in light of the testimony detailing each and every fact relating to the crime scene and victims.

"I also part company with my colleagues' conclusion the case against Scheid was 'marginal at best.' There was substantial evidence of Scheid's knowing involvement in the shooting based on, inter alia, her (1) casing the victims' house, (2) carrying the guns to the scene, and (3) making false statements to police following her arrest. Moreover, even if she lacked knowledge of the murder plot and intended only to facilitate the robbery, she would still be liable for murder under the felony-murder rule. (See *People* v. *Berryman* (1993) 6 Cal.4th 1048, 1085 [25 Cal.Rptr.2d 867, 864 P.2d 40].)

"When all is said and done, the only thing the jury had to decide was who was telling the truth. The jury did not believe Scheid. The erroneous admission of the photograph did not make a difference. I would affirm the judgment."

On petition of the People, we granted review of the Court of Appeal's decision.

### III.

As noted, the Court of Appeal majority concluded that the trial court erred in admitting the challenged photograph, and that the erroneous admission of this item of evidence was prejudicial and requires reversal of defendant's convictions.

In reviewing the judgment of the Court of Appeal, we begin with the question whether the trial court erred in admitting the photograph. The admissibility of this evidence has two components: (1) whether the challenged evidence satisfied the "relevancy" requirement set forth in Evidence Code section 210, and (2) if the evidence was relevant, whether the trial court abused its discretion under Evidence Code section 352 in finding that the probative value of the photograph was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. We address these issues in turn.

### A.

The rules pertaining to the admissibility of photographic evidence are well settled. ██ Only relevant evidence is admissible (Evid. Code, § 350; *People* v. *Crittenden* (1994) 9 Cal.4th 83, 132 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People* v. *Garceau* (1993) 6 Cal.4th 140, 176-177 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People* v. *Babbitt* (1988) 45 Cal.3d 660, 681 [248 Cal.Rptr. 69, 755 P.2d 253]), and all relevant evidence is admissible, unless excluded under the federal or California Constitution or by statute. (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d).) Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends " 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" (*People* v. *Garceau,*

*supra,* 6 Cal.4th at p. 177.) The trial court has broad discretion in determining the relevance of evidence (*ibid.; People* v. *Crittenden, supra,* 9 Cal.4th at p. 132; *People* v. *Babbitt, supra,* 45 Cal.3d at p. 681), but lacks discretion to admit irrelevant evidence. (*People* v. *Crittenden, supra,* 9 Cal.4th at p. 132; *People* v. *Burgener* (1986) 41 Cal.3d 505, 527 [224 Cal.Rptr. 112, 714 P.2d 1251].)

The People contend the photograph was relevant to assist the jury in understanding the testimony of Kazumi Hanano and that of his son, Dean. In support of this contention, the People rely upon a number of our decisions in which we have held that a photograph need not be excluded as cumulative if offered to prove facts established by testimony. (See, e.g., *People* v. *Medina* (1995) 11 Cal.4th 694, 754-755 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People* v. *Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610], and cases cited therein.) The People assert that the relevance of the photograph was unaffected by the prosecution's reliance upon a theory of felony murder—a theory signifying that malice was not a disputed issue at trial.

Defendant contends the photograph was irrelevant because Kazumi was able to (and in fact did) testify to the events that led to the scene depicted in the photograph, and because Dean was able to (and in fact did) testify to the grisly sight he encountered upon discovering his parents several hours after they were shot. In addition, defendant contends that because the prosecution tried the case on a felony-murder theory that sought to establish defendant's culpability for the murder of Ryoko based upon her having facilitated the · underlying robbery (and not upon any involvement in the actual shootings), the gory scene depicted in the photograph had no place in her trial, since malice is not a contested issue in a felony-murder prosecution. (See *People* v. *Turner* (1984) 37 Cal.3d 302, 320-321 [208 Cal.Rptr. 196, 690 P.2d 669] [it was error to admit into evidence four crime scene photographs, because the prosecution based its case on a felony-murder theory].) As noted, at the hearing on the defense motion to exclude the photograph, defense counsel indicated that he and the prosecutor were prepared to stipulate "as to cause of death, [and] which murder weapon was used." Thus, according to defendant, the photograph was probative only of matters that were not in dispute. (See *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1137 [240 Cal.Rptr. 585, 742 P.2d 1306].) In addition, because it is undisputed that defendant already had departed from the residence prior to the shootings of Kazumi and Ryoko, defendant contends the photograph could not have legitimately assisted the jury in performing its function.

Defendant's position is based upon an inappropriately narrow view of the concept of relevancy. ■ As we shall explain, the photograph was "relevant" within the meaning of Evidence Code section 210, for each of the following reasons.

First, as contended by the prosecution when it urged admission of the photograph, Kazumi and Dean, while under stress, gave statements to the police shortly after the shootings, and the photograph was relevant because it was supportive of those statements and of the testimony the prosecution anticipated they would give on the witness stand. The photograph illustrated Kazumi's testimony that his left hand was handcuffed to that of his wife, and it clarified Dean's testimony regarding what he saw when he entered his parents' bedroom several hours after the shootings—for example, "I saw a bullet sitting on the bed," and "They [the victims] were handcuffed together." (See *People* v. *Garceau*, *supra*, 6 Cal.4th 140, 181 [photograph of mummified victims hidden within a dresser was highly probative, because it corroborated testimony relating to concealment of the bodies]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1256 [232 Cal.Rptr. 849, 729 P.2d 115] [nine photographs of victims were "clearly relevant" to corroborate witnesses' testimony "concerning the location and manner in which the victims were shot"]; accord, *People* v. *Sanders* (1990) 51 Cal.3d 471, 514-515 [273 Cal.Rptr. 537, 797 P.2d 561].) The photograph thus was corroborative of the testimony of Kazumi regarding the circumstances of the crime, and of the testimony of Dean regarding the shocking scene he encountered; the photograph bolstered the witnesses' credibility. Further, the photograph provided a visual image of the traumatic events, thereby helping to explain the stress Kazumi and Dean experienced when questioned by the police, and why these witnesses may have had difficulty recalling certain details.

Second, the photograph of the crime scene, showing the victims as they were found by Dean, was relevant in establishing the fact that a murder had occurred. The circumstance that the prosecution proceeded on a felony-murder theory, involving the robbery of the Hananos, did not relieve the prosecution of its burden of proving that Ryoko had been killed in the course of the underlying robbery. Just as Kazumi's testimony relating the circumstances surrounding the shootings and the killing of Ryoko constituted relevant evidence pertaining to her murder, the photograph showing her bloodied, lifeless body was relevant to establish that a murder had occurred. The circumstance that other evidence existed to establish the murder did not render the photograph irrelevant for purposes of Evidence Code sections 210 and 350. (See, e.g., *In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843 [40 Cal.Rptr.2d 85] ["Evidence may be relevant even though it is cumulative; thus, the only ban on cumulative evidence is found in Evidence Code section 352."].)

Third, the photograph was relevant because it established that the victims had been handcuffed, thereby suggesting one of the means by which the

perpetrators of the crimes facilitated the robbery and supporting the prosecution's theory that Taylor, DeWitt, and defendant—prior to arriving at the Hananos' residence—had planned to rob their victims. (See *People* v. *Wilson* (1992) 3 Cal.4th 926, 938 [13 Cal.Rptr.2d 259, 838 P.2d 1212] [photographs of robbery-murder victim were relevant because, among other reasons, they depicted the victim's belt undone, a circumstance that supported the prosecution's theory that his trucker's wallet had been affixed to his belt and removed by his assailant]; *People* v. *McKinney* (1979) 95 Cal.App.3d 712, 734 [157 Cal.Rptr. 414] [upholding the admission of handcuffs into evidence in a robbery-murder case].) The prosecution's case against defendant for the murder of Ryoko was based upon the theory that, prior to arriving at the Hananos' residence with Taylor and DeWitt, defendant was aware of the planned robbery and provided assistance in facilitating it. The photograph, depicting the victims handcuffed together, thus was relevant in discrediting any possible suggestion that the felonies committed at the Hananos' residence were the result of decisions made on the "spur of the moment" after defendant already had departed.[4]

It is true that with regard to each of the foregoing grounds, the prosecution could have relied upon other evidence to establish the matter at issue. Subject to the trial court's authority to exclude cumulative evidence under Evidence Code section 352 (discussed *post*), it is immaterial for purposes of determining the relevance of evidence that other evidence may establish the same point. In short, the photograph clearly satisfied the relevancy requirement under the very broad standard of relevance embodied in Evidence Code section 210.

■ The defense's offer to stipulate as to the fact or manner of the shootings did not negate the relevance of the photograph. "The prosecutor ' "was not obliged to prove these details solely from the testimony of live witnesses" [citation] or to accept antiseptic stipulations in lieu of photographic evidence. "[T]he jury was entitled to see how the physical details of the scene and the bod[ies] supported the prosecution theory . . . ." ' (*People* v. *Pride* [(1992)] 3 Cal.4th 195, 243 [10 Cal.Rptr.2d 636, 833 P.2d 643].)" (*People* v. *Crittenden, supra,* 9 Cal.4th at p. 133; see also *Old Chief* v. *United States* (1997) 519 U.S. 172, __ [117 S.Ct. 644, 653, 136 L.Ed.2d 574, 592] [Conventional evidence, as contrasted with a stipulation, "tells a colorful story with descriptive richness. . . . This persuasive power of the concrete

---

[4]The circumstance that the photograph shows the mattress having been pulled away from the victims' heads, rather than on top of them as first encountered by Dean, and shows a lengthy tear in Kazumi's shirt (created presumably when medical aid was administered) does not render the photograph irrelevant. In his direct examination of Dean, the prosecutor properly noted these distinctions.

and particular is often essential to the capacity of jurors to satisfy the obligations that the law places on them."]; *People* v. *Fierro* (1991) 1 Cal.4th 173, 222-223 [3 Cal.Rptr.2d 426, 821 P.2d 1302], and cases cited therein; *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1007 [254 Cal.Rptr. 586, 766 P.2d 1] ["The general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness."].) Similarly, the circumstance that defendant did not challenge the testimony of Kazumi or Dean as to anything depicted in the photograph did not render the photograph irrelevant; as noted, the photograph served to clarify their testimony. (*People* v. *Crittenden, supra*, 9 Cal.4th at p. 132; *People* v. *Thomas* (1992) 2 Cal.4th 489, 524 [7 Cal.Rptr.2d 199, 828 P.2d 101].)

■ We reject defendant's broad contention that because malice is not an issue in a felony-murder prosecution, the crime scene photograph was irrelevant. The circumstance that the murder charge against defendant rested upon a felony-murder theory, based upon defendant's role in facilitating the robbery of the Hananos, did not preclude the prosecution from establishing—through the use of the most probative and compelling evidence available, including Kazumi's testimony and the introduction of the crime scene photograph—that a murder had been committed. Contrary to defendant's contention, this court's discussion in *People* v. *Turner, supra*, 37 Cal.3d 302, 320-321, does not establish that the photograph here at issue was irrelevant.

In *People* v. *Turner, supra*, 37 Cal.3d 302, the court concluded that the trial court in that case had erred in admitting four photographs depicting a bloody crime, but also found that this error was not prejudicial. (*Id.* at p. 321.) In reaching the conclusion that the admission of the photographs was error, the court in *Turner* rejected the trial court's conclusion that the photographs were admissible to show the positions of the bodies and the manner in which the wounds were inflicted, because these issues were deemed to be irrelevant. Similarly, in *Turner*, we rejected the Attorney General's theory that the photographs were admissible to rebut a claim of self-defense, because that theory was never at issue. (*Ibid.*) Our decision in *Turner* did not consider whether the photographs were relevant to establishing that a murder had been committed or whether, as in the present case, the photographs were relevant because they clarified the testimony of witnesses who described the scene of the crime. *Turner* therefore is distinguishable. (See *Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689] ["Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citation.]")

Contrary to defendant's contention, *Turner* does not purport to create a broad rule rejecting or limiting the admissibility of crime scene photographs in all felony-murder cases. Rather, the usual principles of relevance prescribed in Evidence Code section 210, reviewed above, apply to such evidence. This court's decisions rendered subsequently to *Turner* have made it clear that a photograph may be admitted to corroborate a witness's testimony. (See, e.g., *People* v. *Garceau, supra,* 6 Cal.4th 140, 181; *People* v. *Allen, supra,* 42 Cal.3d 1222, 1256.)

Thus, we conclude that the trial court did not err in finding that the photograph constituted relevant evidence.

## B.

As already noted, defendant contends that even if the photograph constituted relevant evidence, the trial court nevertheless erred in denying his motion to exclude this evidence pursuant to Evidence Code section 352. Defendant maintains the photograph was gruesome and likely to inflame the passions of the jury. The People dispute defendant's characterization and contend the trial court did not abuse its discretion in finding that the probative value of the photograph outweighed any potential prejudice. As we shall explain, we agree with the People's position.

Again, we are guided by well-settled rules. "The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]" (*People* v. *Crittenden, supra,* 9 Cal.4th at pp. 133-134.)

As noted, the photograph served to illustrate and corroborate the testimony given by Kazumi regarding the circumstances of the crime, and that given by his son, Dean, regarding his discovery of his parents after the robbery. In depicting the crime scene and, more specifically, the wounds and the shackling of the victims, the photograph portrayed the manner in which the victims were incapacitated so that the robbery and subsequent escape of Taylor and DeWitt could be accomplished. In this regard, the photograph clearly was probative of the planning and deliberation with which the robbery and the other offenses were committed, because it tended to establish the preparation involved in ensuring that the victims would be rendered

helpless. (See *People* v. *Crittenden, supra,* 9 Cal.4th at p. 134.) As we already have observed, because the prosecution's case was based upon the theory that defendant was a participant in a robbery that had been planned in advance, this evidence had probative value with regard to the issue of defendant's guilt. In addition, insofar as defendant is contending that the trial court was required to exclude the photograph under Evidence Code section 352 because that item of physical evidence was cumulative of the testimonial evidence presented, the trial court correctly rejected defendant's argument. (See *People* v. *Wilson, supra,* 3 Cal.4th 926, 938 [" '[W]e have often rejected the argument that photographs of a murder victim should be excluded as cumulative if the facts for which the photographs are offered have been established by testimony.' "]; accord, *People* v. *Kaurish* (1990) 52 Cal.3d 648, 684 [276 Cal.Rptr. 788, 802 P.2d 278]; *People* v. *Thompson* (1988) 45 Cal.3d 86, 115 [246 Cal.Rptr. 245, 753 P.2d 37].)

■ With regard to the issue whether the photograph had a prejudicial effect, we note that "[w]e have described the 'prejudice' referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. (*People* v. *Garceau, supra,* 6 Cal.4th 140, 178.) As we previously have observed, victim photographs and other graphic items of evidence in murder cases always are disturbing. (*People* v. *Hendricks* [(1987)] 43 Cal.3d 584, 594 [238 Cal.Rptr. 66, 737 P.2d 1350].)" (*People* v. *Crittenden, supra,* 9 Cal.4th at p. 134; accord, *People* v. *Fierro, supra,* 1 Cal.4th 173, 223.)

■ Our independent review of the original photograph introduced at the trial convinces us that, although the photograph is unpleasant, it is not unduly gory or inflammatory. (*People* v. *Pride* (1992) 3 Cal.4th 195, 243 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People* v. *Fierro, supra,* 1 Cal.4th 173, 223; *People* v. *Kelly* (1990) 51 Cal.3d 931, 963 [275 Cal.Rptr. 160, 800 P.2d 516]; *People* v. *Turner* (1990) 50 Cal.3d 668, 707 [268 Cal.Rptr. 706, 789 P.2d 887]; *People* v. *Coleman* (1988) 46 Cal.3d 749, 776 [251 Cal.Rptr. 83, 759 P.2d 1260].) As noted by the trial court, the photograph is not "particularly gruesome" relative to the evidence in other cases involving shooting victims; in the photograph challenged here, the victims are depicted facedown, from a distance sufficient to depict most of their bodies as well a partial view of what appears to be a paramedic. The photograph is not a close-up view of the victims' wounds, nor is it a revolting portraiture displaying horribly contorted facial expressions that conceivably could inflame a jury. (See, e.g., *People* v. *Turner, supra,* 37 Cal.3d at pp. 320, 321 & fn. 9 [upholding trial court's finding that four crime scene photographs,

which included a photograph of one victim's head in a large pool of blood and of another victim lying faceup with bleeding wounds, were "not gruesome"]; see also *People* v. *Allen, supra,* 42 Cal.3d 1222, 1258 [victims' bodies were not depicted "in a badly decomposed condition . . . or after they had been grossly disfigured during autopsy"].) Nor did the prosecution seek to reinforce the potential impact of the photograph with multiple exposures of similar views (see *People* v. *Wilson, supra,* 3 Cal.4th 926, 938), or by unduly belaboring the issue by using the photograph extensively in examining the witnesses; as noted above, the prosecutor's questioning of Kazumi and Dean regarding matters depicted in the photograph was brief.

Moreover, as aptly observed in these proceedings by the dissenting justice in the Court of Appeal, the trial court clearly and properly could find that the photograph was not so gruesome as to have impermissibly swayed the jury *"in light of the testimony detailing each and every fact relating to the crime scene and victims."* (Italics added.) As noted above, Kazumi testified in detail as to the events that immediately preceded the execution of his wife and the firing of the shot that left him paralyzed, and Dean described the discovery of his parents approximately six hours after they were shot, as well as his frantic telephone call to "911," seeking emergency medical assistance. (See *People* v. *Allen, supra,* 42 Cal.3d 1222, 1258 [observing that the inflammatory nature of nine photographs "was relatively slight in comparison with the heinous nature of the crime presented to the jury through the testimony of witnesses"].)

Finally, even if the photograph engendered an emotional response among the jurors, we believe the risk defendant would be prejudiced by that response was minimal, because the jury knew defendant had not been present during the shootings, and also knew that Taylor and DeWitt already had been convicted of the murder of Ryoko and the attempted murder of Kazumi. (Cf. *People* v. *Ewoldt* (1994) 7 Cal.4th 380, 405 [27 Cal.Rptr.2d 646, 867 P.2d 757] [prejudice from evidence of other crimes is decreased when jury is aware that the other crime resulted in a conviction].)

In sum, we find that the trial court reasonably could determine that the probative value of the photograph outweighed its potentially prejudicial effect. We thus conclude that the trial court did not abuse its discretion under Evidence Code section 352 in admitting the photograph into evidence. (*People* v. *Crittenden, supra,* 9 Cal.4th at p. 134; *People* v. *Wilson, supra,* 3 Cal.4th at p. 938; *People* v. *Mickey* (1991) 54 Cal.3d 612, 656 [286 Cal.Rptr. 801, 818 P.2d 84]; *People* v. *Cox* (1991) 53 Cal.3d 618, 666 [280 Cal.Rptr. 692, 809 P.2d 351]; *People* v. *Benson* (1990) 52 Cal.3d 754, 786 [276

Cal.Rptr. 827, 802 P.2d 330].) In reaching a contrary conclusion, the Court of Appeal erred.

## C.

■ Finally, even if we were to agree with the Court of Appeal's conclusion that the trial court erred in admitting the photograph in question, we nonetheless would conclude that any error in admitting the photograph clearly was harmless under the *Watson* standard. (See *People* v. *Allen, supra,* 42 Cal.3d 1222, 1258, applying the standard of *People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

Under the *Watson* standard, the erroneous admission of a photograph warrants reversal of a conviction only if the appellate court concludes that it is reasonably probable the jury would have reached a different result had the photograph been excluded. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.) In the present case, the Court of Appeal majority did not conclude, and defendant does not now contend, that the evidence presented by the prosecution was insufficient to support defendant's conviction. The Court of Appeal majority reasoned, however, that because in its view the prosecution's case against defendant was not strong, reversal was required under the *Watson* standard in the event the trial court erred in admitting the photograph.

We disagree with the Court of Appeal majority's conclusion that the admission of the photograph was prejudicial under the *Watson* standard. Without commenting upon the Court of Appeal's view as to the claimed weakness of the prosecution's case, we do not believe the alleged error in admitting the photograph would warrant reversal whatever the relative strength of the People's evidence. The photograph at issue did not disclose to the jury any information that was not presented in detail through the testimony of witnesses. Although the photograph was unpleasant, it was not unusually disturbing or gruesome, and it certainly was no more inflammatory than the graphic testimony given by the paralyzed victim, Kazumi Hanano, which properly was admitted. Moreover, the prosecutor introduced only a single photograph of the murder scene and did not dwell on the photograph. Under these circumstances, regardless of how one might evaluate the strength of the prosecution's case, we conclude it is not reasonably probable that the admission of the photograph affected the jury's verdict. (*People* v. *Allen, supra,* 42 Cal.3d at p. 1258.)

## IV.

We conclude the judgment of the Court of Appeal should be reversed and the case remanded to that court for consideration of the remaining issues raised by defendant on appeal.

Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.