Filed 1/9/15  P. v. Meraz-Espinoza CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B250149 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA118531) |
| v. | |
| MOISES MERAZ-ESPINOZA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Thomas McKnew, Judge.  Affirmed.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Jessica C. Owen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Moises Meraz-Espinoza of the first degree murder of his mother, Amelia Espinoza.[1] On appeal, defendant contends: (1) the trial court erred in admitting the testimony of the coroner and accompanying photographs that described and depicted the victim's dismembered body as it was found at the crime scene; (2) the trial court erred in allowing a prosecution expert to testify that the method of dismemberment and circumstances of the crime were indicative of premeditation; and (3) the trial court erred in its instructions related to reasonable doubt and the degree of murder. We find no reversible error and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 2, 2011, defendant, then 19 years old, strangled his mother and dismembered her body. Two days later, he called his cousin, Liliana Rivera, and asked what was the worst thing practitioners did in her religion—Santeria. Rivera was concerned. She went to defendant's apartment to pick him up. He was waiting outside when she arrived. When Rivera asked where her aunt, defendant's mother, was, he said she was not home. When Rivera asked where Espinoza had gone, defendant said she just left. Rivera thought this was strange. While Rivera and defendant were in her car, defendant said he had killed Espinoza. Rivera did not believe him. When Rivera asked how, defendant said he choked Espinoza, skinned her, and cut her into pieces. He said his mother's bones were in his backpack and the "meat" was in the refrigerator. No one heard what happened, or heard him using a saw to cut up the body, because he was playing loud music. Defendant said he felt peaceful, "like an angel."

According to Rivera, defendant liked "goregrind" and death metal music. She described goregrind as primarily about mutilation. Rivera knew defendant had a satanic bible. Defendant had rebelled against his mother and began "acting out" when he was 18 years old. He and his mother fought over the rules of the house, which he resented.

---

[1] To avoid confusion, we refer to defendant Meraz-Espinoza as "defendant," and to Amelia Espinoza as "Espinoza."

After defendant told Rivera of the murder, she drove him to the police station so he could turn himself in. Defendant called his father and told him Espinoza "isn't here anymore" and was "asleep." Outside the police station, defendant told his father Espinoza was dead and he had helped her to die. Defendant was crying, making it difficult for his father to understand him. When defendant walked into the police station, he told a lieutenant on duty that he had killed his mother and dismembered her body. When a deputy sheriff arrived to transport defendant to East Los Angeles, he introduced himself and asked if defendant knew why he was there. Defendant responded: "I killed my mom."

At defendant's apartment, law enforcement officers found a refrigerator lying on the living room floor. Bags containing human remains were inside the refrigerator. They also found plastic bags on the walls, a circular or "worm drive" saw, and a knife in the shower. The shower walls were lined with painter's plastic sheeting, secured with duct tape. There appeared to be blood, particles of skin, and particles of bone in the shower. There was a backpack in the apartment, inside of which police found human bones and a skull. Law enforcement also found a spray cleanser that indicated it could be used to clean blood. Law enforcement further recovered a DVD of the movie *Saw*,[2] a satanic bible, and a laptop computer. There were drawings on a closet door of images associated with satanic beliefs. A forensic examination of the computer revealed song lyrics, including for the songs "Dismember, Skin Her Alive," and "Harlots of Satan."

At trial, the coroner testified the cause of death was "asphyxia by neck compression," or strangulation. She also testified the body had been meticulously dismembered after the victim's death. For example, the fingertips appeared to have been removed individually, with a sharp instrument, at the joints. Skin from the head was removed in one piece, except for the eyelids. The teeth had all been removed from their

---

[2] The prosecution expert testified the movie *Saw* was in a horror movie/ death metal genre, and was part of a "subculture of blood and gore."

sockets. Except for the hands and feet, the skin was severed from all other body parts. The genitalia had been cut out, and all internal organs were missing.

The People offered testimony from an expert on symbols, rituals, and unfamiliar practices. The expert opined that the "body disposition" suggested a ritual killing. The expert explained: "In this case the body was dismembered, flayed, filleted, eviscerated, decapitated, and desanguinated, and the skin from the face, scalp, and head was removed in one piece. The teeth, fingers, toes, and eyes were removed, and several internal organs were absent. This is really the very definition of a ritual killing, the fact that all of these things were done. In ritualistic crimes, acts of mutilation, evisceration, and the disposal and positioning of the body holds magical meaning to . . . the offender, and it's usually a necessary function of the ritual. In other words, it's not done to avoid – it's not a counter-forensic measure to try to avoid detection, it's done in terms of magic . . . magical meaning, whether it's going to benefit you. It's a form of worship."

In response to a hypothetical question regarding the disposition of a body in the manner evidenced in this case, the expert opined that the actions taken would go beyond what was necessary to simply dispose of a body. The expert further identified some of the symbols and images found on the computer recovered from defendant's apartment, elsewhere in the apartment, and in his jail cell, as satanic symbols or images related to satanic beliefs. Some of the imagery related to the musician King Diamond, who the expert described as a "self-proclaimed LaVeyan Satanist."[3] According to the expert, the date of the murder, February 2, is a holiday for Satanists that requires "sexual and blood rituals," including blood offering carried out by human or animal sacrifice. The expert further opined defendant's tattoos may have had symbolic significance, such as a "666" tattooed behind his ear, which the expert indicated is representative of Satanism; a trident tattooed on defendant's back which was similar to a trident symbol

---

[3] These included photographs of defendant in makeup that appeared to resemble makeup worn by King Diamond. In the photographs, defendant had a rosary in his mouth with an inverted crucifix. The expert opined that an upside down cross is a "classic symbol of satanism."

associated with Satanism; and goat-devil-type figures with serpents' tails and a hatchet, which the expert associated with the worship of the goat, and as very symbolic of Satanism.

Defendant offered no evidence.

The jury found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a).) The trial court sentenced defendant to a total prison term of 25 years to life. Defendant timely appealed.

## DISCUSSION

**I.     The Trial Court Did Not Err in Admitting the Coroner's Testimony and Accompanying Photographs**

Defendant contends the trial court erred in failing to exclude the coroner's testimony and the photographs accompanying the testimony, under Evidence Code section 352. Defendant further asserts the error was so grave it violated his right to due process under the Fourteenth Amendment. Defendant argues the evidence was cumulative and unnecessary, and was unduly prejudicial. We disagree.

"Under section 352, it is proper to admit relevant evidence when the probative value of that evidence is not substantially outweighed by its prejudicial effect. [Citation.] The trial court's decision is reviewed for abuse of discretion." (*People v. San Nicolas* (2004) 34 Cal.4th 614, 664.) In addition, "[a] trial court's 'decision to admit victim photographs is a discretionary matter that we will not disturb on appeal unless the prejudicial effect of the photographs clearly outweighs their probative value. [Citations.]' [Citations.] '[M]urder victim photographs need not be rejected merely because they are cumulative to other evidence in the case. [Citation.]' [Citation.]" (*People v. Rogers* (2009) 46 Cal.4th 1136, 1164.)

As an initial matter, we must reject defendant's argument on appeal that the coroner's testimony by itself was erroneously admitted because he never objected to the testimony in the trial court. Although defense counsel clearly objected to the admission of the photographs that accompanied the testimony, counsel never objected that the coroner's testimony should otherwise be excluded or limited. Any claim of error on that

5

basis is forfeited. Yet, even had defendant preserved the claim, we would reject it as described below.

We begin by noting the prosecution sought to introduce more photographs than were eventually admitted. The trial court reviewed the pictures and excluded several it determined were repetitive, duplicative, or unduly gruesome. We can find no abuse of discretion in the court's conclusion that the admitted photographs were relevant. It was undisputed that the dismemberment of the body occurred after death. Yet, the photographs were not "rendered irrelevant simply because defendant did not dispute the cause of death," or the nature and extent of the dismemberment of the body. (*People v. Heard* (2003) 31 Cal.4th 946, 975 (*Heard*).) The prosecution sought to prove that the murder was premeditated, and was, in fact, a ritual murder consistent with certain Satanic beliefs. Evidence regarding the state in which Espinoza's body was discovered was relevant, and indeed critical, to that theory. In addition, some detail of the dismemberment was necessary to establish it was not likely to have been undertaken simply to obscure Espinoza's identity. The meticulousness of the dismemberment tended to prove the prosecution's theory that the murder and defendant's subsequent actions established the entire event was deliberate and premeditated.

The photographs illustrated and corroborated the coroner's testimony and had significant probative value. "Although it is true that the prosecution could have relied upon other evidence to establish the matter at issue, 'it is immaterial for purposes of determining the relevance of evidence that other evidence may establish the same point.' [Citations.]" (*Heard*, *supra,* 31 Cal.4th at p. 975.) "The state is not required to prove its case shorn of photographic evidence merely because the defendant agrees with a witness or stipulates to a fact." (*People v. Weaver* (2001) 26 Cal.4th 876, 933.) A jury is entitled to see the physical details of a crime scene. (*Ibid.*)

Further, we find no abuse of discretion in the trial court's conclusion that the prejudicial nature of the photographs did not outweigh their probative value. Our high court has "described the "prejudice" referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as

6

an individual, while having only slight probative value with regard to the issues. [Citation.] As we previously have observed, victim photographs and other graphic items of evidence in murder cases always are disturbing." (*People v. Scheid* (1997) 16 Cal.4th 1, 19 (*Scheid*).) The disturbing nature of such evidence alone does not necessarily render it impermissibly prejudicial under Evidence Code section 352.

Our own review of the photographs confirms that they were gruesome, particularly when explained by the coroner's testimony. However, we cannot find that the prejudicial effect of the photographs clearly outweighed their probative value. The dismemberment of the body in this case was unusual. Evidence regarding the extremity of the actions taken was highly probative of the prosecution's theory that Espinoza's death was the result of a ritual murder. The evidence was also relevant to defeat any argument that what happened was an unplanned killing, followed by efforts to render the body unidentifiable. In addition, the photographs were limited and the coroner's explanatory testimony was clinically descriptive and not inflammatory.[4]

We also reject the argument that the photographs were unduly prejudicial because they were cumulative. As explained in *People v. Raley* (1992) 2 Cal.4th 870, 897, " 'The prosecution was not obliged to prove [the details of the crime] solely from the testimony of live witnesses, and the jury was entitled to see how the physical details of the scene and body supported the prosecution theory . . . .' [Citations.]" Further, the prosecutor did not "seek to reinforce the potential impact of the photograph[s] with multiple exposures of similar views . . . or by unduly belaboring the issue by using the photograph[s] extensively in examining the witnesses . . . ." (*Scheid, supra,* 16 Cal.4th at p. 20.) The jury was shown a limited number of photographs showing the victim's body parts as recovered in defendant's apartment. The court could reasonably determine the probative value of the photographs outweighed their potentially prejudicial effect.

---

**4** The court admitted a total of 18 photographs depicting the victim's body parts. Some of the photographs were printed two per page, thus there were 10 body part photograph exhibits in all.

7

We find no abuse of discretion. We thus likewise reject defendant's related constitutional claims. (*People v. Weaver, supra,* 26 Cal.4th at p. 934.)

Moreover, even were we to find the trial court should have excluded some or all of the photographs, we would find the error harmless. (*Scheid, supra,* 16 Cal.4th at p. 21.) This was not a close case. The evidence was overwhelming that defendant murdered his mother and that the murder was deliberate and premeditated. Defendant spontaneously admitted to several people that he had killed his mother and dismembered her body. The coroner testified, without objection, that the method of the killing – strangulation – required at least one or two minutes to cause death, and that it was a "deliberate mode" to kill someone. Further, even an abbreviated and sanitized description of the state of the body and the crime scene, unaccompanied by photographs, would have amply supported the expert's opinion that the killing was a ritual murder, and a corresponding conclusion that the murder was deliberate and premeditated. The evidence established defendant had embraced multiple symbols of Satanic beliefs, and that the murder took place on a day associated with "blood offerings" and human sacrifice among some Satanists.

In addition, the testimony of the coroner was, without doubt, admissible, even under section 352. The disposition of the body was, simply, gruesome. Yet evidence of the dismemberment was highly relevant to prove the prosecution's theory of ritual murder, and that it was deliberate and premeditated. The photographs did not disclose any information to the jury that was not presented in detail through the coroner's testimony. (*Heard, supra,* 31 Cal.4th at p. 978; *Scheid, supra,* 16 Cal.4th at p. 21.) Thus, even if the photographs were prejudicial, we conclude it is not reasonably probable that the admission of the photographs affected the jury's verdict.

## II. Expert Testimony

Defendant contends the trial court erred in admitting expert testimony that constituted an opinion on whether defendant engaged in premeditation and deliberation when killing his mother. We find no reversible error.

" 'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code,

§ 720) and to give testimony in the form of an opinion (*id.,* § 801). Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Id.,* subd. (a).)' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*).) Defendant concedes that the expert's testimony regarding "signs, symbols and ritualistic crimes in general," was proper. However, he contends the expert's opinion that the post-mortem actions inflicted on the body were "the very definition of a ritual killing," was improper, as well as the opinion that a Satanist's act of murdering someone on February 2 "would indicate premeditation with the idea that somebody had chosen that date to murder someone."

We disagree that it was improper for the trial court to admit the expert's opinion that the state of the body when discovered at the crime scene was consistent with a ritual killing. As explained in *Vang,* " '[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' [Citations.] Rather, the reason for the rule is similar to the reason expert testimony regarding the defendant's guilt in general is improper. 'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." ' [Citations.]" (*Vang, supra*, 52 Cal.4th at p. 1048.)

Opining that the dismemberment of the body was consistent with a ritual killing or a ritual sacrifice was not equivalent to an opinion on defendant's guilt or innocence. Instead, identifying the aspects of the crime scene that were consistent with a particular satanic ritual was proper testimony on an issue beyond common experience that could assist the trier of fact in determining whether defendant was guilty of the murder, and whether the jury should conclude the murder was willful, deliberate, and premeditated.

9

We agree, however, that the expert's testimony that a Satanist's act of killing a victim on February 2 would indicate "premeditation," was improper expert opinion. The question was hypothetical, and the problem was not that the question and answer concerned the "ultimate issue of guilt." But it was clear that the expert's opinion on premeditation was not based on any specialized skill, knowledge, experience, or training. Instead, the expert explained a Satanist's killing on that date would indicate premeditation "with the idea that somebody had chosen that date to murder someone." Once informed of the significance of February 2 for Satanists, the jury was as competent as the expert to weigh the evidence and draw a conclusion on the issue of the premeditation or deliberation.

However, we find any trial court error in admitting the testimony was harmless under any standard. The premeditation answer was only one brief portion in the relatively lengthy and otherwise proper expert testimony. Further, later in the testimony, the expert testified, without objection, that in examining a possible ritual killing, she looked for certain signs to determine wither it was a "pre-planned sacrifice," including "the date, the type of trauma, if it's connected to any particular items that are required of that date." She also testified that in this case the signs that were present included "the flaying, the mutilation, the body disposition, the loss of blood, and the date of the crime." The vast majority of her testimony concerned Satanic beliefs and symbols, possible interpretations of the symbols found in defendant's home or on his person as tattoos, and her opinion on whether the killing and dismemberment in this case was consistent with a Satanic ritual killing.

In addition, there was significant evidence from other sources regarding premeditation, such as the coroner's testimony about the meticulousness of the dismemberment and the nature of strangulation. Likewise, there was evidence regarding defendant's penchant for music and other materials concerning dismemberment, poisoning, and Satanic beliefs or practices. It is not reasonably probable that, absent any improper testimony explicitly about "premeditation," the verdict would have been more favorable to defendant. (*People v. Spence* (2012) 212 Cal.App.4th 478, 510-511.)

10

Nor do we agree that any such error deprived defendant of his right to a fair trial. (*People v. Doolin* (2009) 45 Cal.4th 390, 444.) The evidence of defendant's guilt of first degree murder was overwhelming, such that we can be confident the jury would have reached the same verdict regardless of any error. (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1535.)

**III.    The Trial Court Properly Instructed on Reasonable Doubt and the Degree of Murder**

Finally, defendant contends the trial court erred in failing to give an instruction consistent with *People v. Dewberry* (1959) 51 Cal.2d 548, 555 (*Dewberry*). We find no reversible error. [5]

*Dewberry* stands for the proposition that " 'a criminal defendant is entitled to the benefit of a jury's reasonable doubt with respect to all crimes with lesser degrees or related or included offenses.' [Citations.]" (*People v. Friend* (2009) 47 Cal.4th 1, 55, citing *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1262 (*Musselwhite*) and *Dewberry, supra,* 51 Cal.2d at p. 556.) Thus, in *Dewberry*, the trial court instructed that if the jurors decided the defendant committed murder but they had a reasonable doubt as to the degree, they should give the defendant the benefit of the doubt and find him guilty of second degree murder. It similarly instructed as to manslaughter and justifiable homicide. But the trial court refused to give a general instruction "that would have told the jury that if it found the defendant ' "was guilty of an offense included within the charge . . . , but entertain a reasonable doubt as to the degree of the crime of which he is guilty, it is your duty to convict him only of the lesser offense." ' [Citation.]" (*Musselwhite*, at p. 1263.)

---

[5]    Defendant also summarily contends the court erred in failing to sua sponte instruct the jury with CALCRIM No. 640. However, he does not support this contention with any argument except to identify the instruction and to assert the failure to give the instruction "compounded" the court's other instructional failure. We find any argument that the court erred in failing to give CALCRIM No. 640 to be insufficiently developed and we do not consider it. (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1396-1397.)

11

The court found this was error because the "failure of the trial court to instruct on the effect of a reasonable doubt as between any of the included offenses, when it had instructed as to the effect of such doubt as between the two highest offenses, and as between the lowest offense and justifiable homicide, left the instructions with the clearly erroneous implication that the rule requiring a finding of guilt of the lesser offense applied only as between first and second degree murder." (*Dewberry,* at p. 557.)

Defendant contends the trial court here should have sua sponte instructed the jury that if it had a reasonable doubt as to the degree of murder, it should give defendant the benefit of the doubt and find him guilty only of second degree murder. We disagree that such an instruction was required in this case. The trial court instructed the jury thoroughly regarding the reasonable doubt standard, and its application to the degrees of murder. While a court must instruct on the general principles of law governing the case even absent a request, "[t]he court has no duty to give an instruction if it is repetitious of another instruction also given." (*People v. Barajas* (2004) 120 Cal.App.4th 787, 791.) In addition, " ' " '[t]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " ' [Citation.]" (*Ibid,* citing *Musselwhite, supra,*17 Cal.4th at p. 1248.)

Here, the court instructed the jury with a modified version of CALCRIM No. 520, which stated in relevant part: "If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined by these instructions." The court also instructed the jury with CALCRIM No. 521, which stated in relevant part: "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

The court further gave the general instruction CALCRIM No. 224 regarding circumstantial evidence, which stated in relevant part: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to

12

that conclusion beyond a reasonable doubt. Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another guilt, you must accept the one that points to innocence." This was followed by CALCRIM No. 225 on circumstantial evidence of intent, which included the language: "[B]efore you may rely on circumstantial evidence to conclude that the defendant had the required intent you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent was not proved by the circumstantial evidence."

These instructions together covered the concern addressed in *Dewberry*. The jury was clearly informed that if it found defendant murdered Espinoza it had to decide the degree of the murder, and it could not convict defendant of first degree murder if the People had not proved beyond a reasonable doubt that the murder was first degree rather than a lesser crime. As in *Musselwhite*, the court gave "the jury several generally applicable instructions governing its use of the reasonable doubt standard. All redounded to defendant's benefit in the sense that each required the jury, where it had a reasonable doubt as to *any included or related offenses or degrees,* to find defendant guilty of the lesser included or related offense or lesser degree, that is, to give defendant the benefit of any reasonable doubts it may have had." (*Musselwhite,* 67 Cal.4th at p. 1263.) We find no error in the trial court's instruction on reasonable doubt and the degree of murder.[6]

---

[6]    Even if the court erred, we would find any error to be harmless, for the same reasons explained above. (*People v. Crone* (1997) 54 Cal.App.4th 71, 78.) The instructions, taken together, clearly informed the jury it could not find defendant guilty of first degree murder unless the People proved first degree murder beyond a reasonable

13

## DISPOSITION

The judgment is affirmed.

BIGELOW, P.J.

We concur:

FLIER, J.

GRIMES, J.

---

doubt.  In addition, the evidence indicating the murder was willful, deliberate, and premeditated was almost completely uncontradicted.  It is not reasonably probable that, with the benefit of a *Dewberry*-based instruction, the result of the trial would have been more favorable to defendant.

14