Filed 6/14/13  P. v. Taplin CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DWAYNE MARLIN TAPLIN II,<br><br>Defendant and Appellant. | C067534<br><br>(Super. Ct. Nos. 09F04776 &<br>09F05082) |

A jury convicted defendant Dwayne Marlin Taplin II of second degree robbery and assault with a semiautomatic firearm, and it found true certain enhancement allegations.  The trial court sentenced defendant to 19 years in state prison.

Defendant now contends (1) the prosecutor committed prejudicial misconduct in closing argument by misstating the law regarding circumstantial evidence, and (2) the trial court abused its discretion in admitting photos depicting defendant holding firearms. We conclude defendant's contentions lack merit, and we will affirm the judgment.

1

BACKGROUND

On February 17, 2009, David Roots mentioned to his friend, Vincent Bracy, that he was interested in buying a two-door Lexus with his $6,000 tax refund. Bracy later told Roots that he had located a similar car on Craigslist, and had arranged for the prospective seller to bring the car that night to a Shell gas station in Sacramento. Roots drove to the gas station with his fiancée, Bracy, and another friend.

A few minutes after they arrived, a man pulled up in a two-door, green Lexus with a tan interior. At trial, Roots identified defendant as the driver. Bracy told defendant to open the hood of the car, but when he failed to do so, Bracy reached into the car and released the hood latch himself. Roots thought this was strange, given that Bracy had indicated he did not know the seller of the car.

Bracy told Roots to get in the car and go for a ride. With defendant driving, the two men pulled out of the gas station and drove through a residential area. When Roots asked defendant some questions about the car, instead of responding he slowed down, looked at his cell phone, and turned down a side street. Defendant stopped the car, pulled out a semiautomatic gun, chambered a round and pointed the barrel at Roots's head. Defendant said, "Give [me] your fucking money right now."

Roots was carrying over $3,000 in cash and money orders. He pulled some of the money from his pocket and threw it on the floorboard, telling defendant he could have it. Roots pushed the gun down with both hands, and it went off, striking him above the right knee. Roots opened the door to escape, but defendant grabbed him by the collar and said, "[G]et your ass back [in] here." Defendant reached into Roots's pocket to get more money.

Roots managed to get out of the car and use his cell phone to call 911, telling the operator that he did not know who shot him. The call was made around 7:48 p.m. With blood running down his leg, he walked toward an apartment complex where he collapsed in a pool of blood. Emergency personnel arrived and transported Roots to a hospital,

2

where he underwent surgery for a damaged artery. He could have bled to death without the surgery.

Detective Zachary Bales interviewed Roots at the hospital. Roots described the gunman as an African American man, about five feet six inches tall, and 260 to 280 pounds. The robber wore a striped polo shirt and a small knitted cap. His description was consistent with a surveillance video that depicted the driver of the Lexus at the Shell station.

On February 21, Detective Bales showed Roots a six-person photo lineup that included a photo of a man who had been pulled over in Fairfield while driving a green Lexus. Roots selected someone other than the person of interest, and said that if the robber was in the lineup, Roots was 75 percent sure that was him. Defendant, who was not a suspect yet, was not in the lineup. When shown the photo of the car that was pulled over in Fairfield, Roots was positive it was not the same car in which he was robbed.

Detective Bales found an expired ad for a similar Lexus on Craigslist. The ad listed a contact number of 510-860-5585, which was a cell phone belonging to Damario Turner of Richmond. The ad had been taken down by February 17, the day of the shooting. DMV records disclosed that Turner owned a 1992 two-door green Lexus. Bales went to Turner's home and found the car, with a bullet hole in the side. Subsequent investigation revealed gunshot residue on the dashboard. At trial, Roots identified Turner's Lexus as the one he was in during the robbery. Roots had never seen Turner's car before that night, but had seen Turner hanging out with Bracy on previous occasions.

Detective Bales obtained records for Turner's cell phone number, as well as Bracy's cell phone number, which was 916-821-3275. On the day of the shooting, there were 25 phone calls between Bracy and Turner. In addition, between 3:02 p.m. and 6:01 p.m., Turner made 14 phone calls to defendant's home phone number in Vallejo, which was 707-647-1006. Cell phone records indicated that in the early evening of

3

February 17, Turner traveled from Richmond to Sacramento and then back to Richmond later that night. At 5:33 p.m., a call between Turner's cell phone and defendant's phone number pinged off of a cell phone tower in Vallejo. Between 7:48 p.m. and midnight, there were seven calls between Turner and Bracy and one between Turner and defendant.

On April 14, Detective Bales prepared a photo lineup that included a picture of defendant, and showed it to Roots. Roots selected defendant's photo and said he was positive he was the one who robbed him.

Two months later, while looking at a friend's Myspace page, Roots saw a photo of a man who resembled the person who shot him. Roots clicked on the photo, which opened up the man's Myspace page, which contained a larger version of the photo. The larger photo depicted the man holding two guns crossed over his chest. Roots could tell from the enlarged photo that the man was definitely the person who robbed him because he had a "face you don't forget." One of the guns in the photo resembled the chrome or grey semiautomatic handgun used in the robbery.

Roots called Detective Bales and told him about the Myspace photos. The page was registered under the first name of "Tap-titty" and the last name of "DA Manager." Other evidence revealed that defendant referred to himself as "Tap." Messages from the Myspace page were exchanged with other Myspace pages linked to Bracy and Turner, including a page for Turner's rap group, "Da 3For1 Deal."

On June 17, Detective Bales interviewed defendant in jail, where he was being held on unrelated charges. Defendant denied knowing anything about the robbery of Roots, and denied knowing Bracy or Turner. He also denied having a Myspace page. On the same day, defendant made a phone call to a woman, who told him that the police were looking at his Myspace page and were seeking additional photos of him. Defendant told the woman, "I ain't got no MySpace," gave her what appeared to be a password, referred again to Myspace, and said "but I don't got nothing like that though. You know

4

what I mean?" The following day, Detective Bales discovered that all of the images and messages had been deleted from Bracy's Myspace page.

On June 18, defendant called the cell phone of Gregory Ortega, a member of Turner's rap group. Defendant said, "Don't say no names--don't say no names or nothing, nigga. They got this on recorder nigga. I'm in jail boy." Defendant stated, "They raided my house on some bullshit," to which Ortega responded, "They raiding everybody's shit right now, cuz." Defendant replied, "Yeah, I heard. I mean, you know, nigga. Somebody tellin'." Ortega responded, "I'm kind of picturing who it was. . . . [¶] . . . [¶] . . . It was old boy." Defendant replied, "Yeah." Defendant told Ortega that the crime of which he was accused occurred in February, adding, "I just wanted to, you know, get the word out there," and to "tell that nigga, nigga I don't know nothing. He don't--you know."

In closing argument during trial, the prosecutor argued that the circumstantial evidence supported the identification by Roots that defendant was the robber. Because Roots had seen Turner with Bracy before and could identify him, Turner and Bracy needed defendant to pretend to be the seller of the car in order to rob Roots.[1] The prosecutor maintained that Turner's cell phone call pattern on the date of the crime indicated that he made the necessary arrangements with defendant earlier in the day, and then picked him up at his residence in Vallejo on the way to Sacramento. The prosecutor argued that defendant's phone calls while in jail supported an inference that he was trying to suppress evidence against him. Additional facts are referenced in the discussion as relevant to defendant's contentions.

Defense counsel argued that Roots was mistaken when he identified defendant, and that the circumstantial evidence was consistent with an innocent man being

---

[1] Pursuant to a plea bargain, Turner and Bracy both pleaded no contest to second degree robbery in exchange for a three-year prison term.

concerned that he was being falsely accused of a crime he did not commit. According to defense counsel, the cell phone evidence did not demonstrate that Turner picked up defendant, who may have been sitting at home when the crime occurred.

The jury convicted defendant of second degree robbery and assault with a semiautomatic firearm. (Pen. Code, §§ 211, 245, subd. (b).)**2** The jury also found that defendant personally used a firearm and caused great bodily injury in the commission of the offenses. (§ 12022.53, subd. (b), 12022.5, subd. (a), 12022.7, subd. (a).) The trial court sentenced defendant to a total prison term of 19 years in state prison.

DISCUSSION

I

Defendant contends the prosecutor committed prejudicial misconduct in closing argument by misstating the law regarding circumstantial evidence. Defendant points to the prosecutor's rebuttal argument, in which she stressed that even if some of the circumstantial evidence could have an innocent explanation, this did not undermine the evidence as a whole. In defendant's view, the prosecutor improperly conveyed to the jury that it could not reject circumstantial evidence of guilt unless the defense had introduced evidence to support an alternate conclusion.

During rebuttal, the prosecutor stated: "What I want to talk to you guys about is, circumstantial evidence is not like a chain where one link breaks and the whole thing is thrown out. It's like a rope. And I've talked about wrapping the defendant up, wrapping that identification up, and that's what it's doing in this case.

"I'm not suggesting that one of the strains [*sic*] of the circumstantial evidence is broken, but if you go back and look at the evidence and you have a problem with one of the pieces of circumstantial evidence, it doesn't break. It's not all of a sudden all thrown

---

**2** Undesignated statutory references are to the Penal Code.

out, all done, the whole case is thrown out. It's a rope. It's tied together and it gives strength to the rest of the evidence. Doesn't automatically break.

"In this case it actually binds and supports the direct evidence. I just wanted you guys to understand you don't throw everything out.

"The other thing about circumstantial evidence is your conclusions have to be reasonable. If you noticed reasonable is used a lot in those jury instructions because that's what it is[,] the reasonableness and common sense.

"What you just heard the defense attorney do--no disrespect to Mr. Renwick at all, he's a great attorney--is speculate for 30 minutes. Yes . . . are there other possible things out there that could explain the evidence? Yes. Are there possible things that you've heard nothing about? Yes. Yes, it's possible there's some other reason that the cell phones are pinging, okay. That's not based on anything you've heard in court.

"Circumstantial evidence and those conclusions have to be reasonable, and they have to be based on the evidence. You could sit and speculate all day about what a call may mean, may not mean. You have to consider that with the evidence."

Defense counsel objected and requested a sidebar. Counsel believed that the prosecutor suggested that the defense was required to introduce evidence to support a reasonable alternative theory pointing to innocence, thereby shifting the burden of proof to the defense.

The prosecutor responded that she simply suggested that inferences drawn from circumstantial evidence have to be reasonable, and based on the evidence as a whole.

The trial court overruled the objection, stating that it did not interpret the prosecutor's argument as shifting the burden of proof to the defendant.

Relying primarily on *People v. Hill* (1998) 17 Cal.4th 800 (*Hill*), defendant maintains the trial court erred, and that the jury likely construed the prosecutor's comments as stating that defendant had the burden of producing evidence supporting a reasonable doubt of his guilt. We disagree.

7

"To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

In *Hill,* the prosecutor improperly shifted the burden of proof to the defendant when she explained reasonable doubt to the jury as follows: " '[I]t must be reasonable. It's not all possible doubt. Actually, very simply, it means, you know, you have to have a reason for this doubt. *There has to be some evidence on which to base a doubt.'* . . . 'There must be *some evidence* from which there is a reason for a doubt. You can't say, well, one of the attorneys said so.' (Italics added.)" (*Hill*, *supra*, 17 Cal.4th at p. 831.)

The California Supreme Court said that "to the extent [the prosecutor] was claiming there must be some affirmative evidence demonstrating a reasonable doubt, she was mistaken as to the law, for the jury may simply not be persuaded by the prosecution's evidence. [Citation.] On the other hand, [the prosecutor] may simply have been exhorting the jury to consider the evidence presented, and not attorney argument, before making up its mind." (*Hill, supra,* 17 Cal.4th at pp. 831-832.) The Supreme Court said the question was arguably close, but it concluded it was reasonably likely that the jury understood the comments "to mean defendant had the burden of producing evidence to demonstrate a reasonable doubt of his guilt." (*Id.* at p. 832.) The Supreme Court reversed the verdict in *Hill,* but it did so based upon "the many acts of prosecutorial misconduct and other errors that plagued that trial." (*People v. Booker* (2011) 51 Cal.4th 141, 186.)

Unlike *Hill,* this case was not plagued with many acts of prosecutorial misconduct, and the prosecutor was not trying to explain to the jury the concept of reasonable doubt.

Rather, the prosecutor commented on the weakness of the evidence supporting an innocent interpretation of the circumstantial evidence, and indicated there was no evidence to support the defense theories. She also exhorted the jury to consider the evidence as a whole. There was no risk that the jury would construe the prosecutor's challenged remarks to mean defendant had the burden of proving reasonable doubt. "A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.)

Furthermore, the trial court clearly instructed the jury that the burden of proof rested with the prosecution (CALCRIM No. 220), and that the jury must follow its instructions, not the attorneys' comments on the law (CALCRIM No. 200). It also properly instructed the jury on the use of circumstantial evidence, advising the jurors that "when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." (CALCRIM No. 224.) Considering the record as a whole, it is not reasonably likely the jury construed the prosecutor's argument to mean defendant had the burden of producing evidence to demonstrate a reasonable doubt. Under the circumstances, defendant's claim of prosecutorial misconduct lacks merit.

II

Defendant next contends the trial court abused its discretion in admitting photos depicting defendant holding firearms.

Two months after Roots identified defendant in a photo lineup, he saw a photo of a man who resembled the person who shot him while looking at a friend's Myspace page. When Roots clicked on the photo, it opened up defendant's Myspace page, which contained a larger version of the photo. The larger photo depicted defendant holding two guns crossed over his chest. One of the guns in the photo resembled the chrome or grey

9

semiautomatic handgun used in the robbery. Roots could definitively discern from the larger photo that it depicted the man who shot him.

Before trial, defense counsel moved to exclude the photos as prejudicial character evidence, arguing that any probative value was outweighed by the prejudicial effect. The prosecutor countered that the photos were relevant because they supported Roots's identification of defendant and because they demonstrated that defendant had access to a gun that was similar to the one used in the robbery.

The trial court ruled that the evidence was relevant to show that the victim identified defendant independently of the photo lineup, to show that defendant was familiar with guns, and that he had access to a firearm that was similar to the one the victim said was used in the robbery. The trial court concluded that the prejudicial effect of the evidence did not outweigh its probative value. We agree.

The photo was highly relevant to the issue of identification, because unlike a photo lineup, there was no possibility of undue suggestion. Rather, Roots was viewing a friend's Myspace page and was surprised to see a photo of the man who shot him. This corroborated his prior identification, which was important given defendant's defense of mistaken identity. Moreover, defendant was holding a gun that looked like the one he used to shoot Roots. As the trial court recognized, had defendant been holding a shotgun it might have been too inflammatory. But because it was a handgun that looked similar to the one used in the robbery, it undermined any claim that defendant did not have access to handguns so he could not have been the robber.

When the admissibility of photographic evidence is challenged on the ground it is unduly inflammatory, the trial court's exercise of discretion will not be disturbed unless the probative value of the evidence is clearly outweighed by its prejudicial effect. (*People v. Crittenden* (1994) 9 Cal.4th 83, 133-134.) Here, the trial court did not abuse its discretion.

10

In any event, even if the trial court erred, the error was harmless. The evidence established that Bracy and Turner arranged to pretend to sell Turner's car to Roots in order to rob him of his $6,000 tax refund. Roots had seen Turner with Bracy so Turner could not perpetrate the robbery lest he be recognized. Other evidence tended to prove that the two men involved defendant in their scheme, as there was a flurry of cell phone activity between the three men on the day of the robbery. More importantly, Roots positively identified defendant in the second photo lineup. Although Roots selected someone else in the first lineup, defendant was not in that lineup and Roots did not claim to be sure of his selection; he said that if the robber was in the lineup and he had to choose someone, he was 75 percent sure of his selection. Even without admitting the Myspace photo, the fact of the victim's independent identification of defendant on Myspace would have been relevant and admissible, as well as defendant's jail telephone conversation with a woman in which he conveyed a coded message to destroy the Myspace evidence, thereby demonstrating a consciousness of guilt. It is not reasonably probable the jury would have returned a different verdict if the photo had been excluded. (*People v. Scheid* (1997) 16 Cal.4th 1, 21.)

DISPOSITION

The judgment is affirmed.


                                                            MAURO            , J.


We concur:


              NICHOLSON        , Acting P. J.


              ROBIE              , J.