Filed 6/27/14  P. v. Johnson CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>VICTOR JOHNSON,<br><br>        Defendant and Appellant. | A138704<br><br>(Alameda County<br>Super. Ct. No. CH51169) |

Appellant, Victor Johnson, was found guilty by a jury of forcible rape and misdemeanor sexual battery.  He claims the trial court erred in overruling his objections to the receipt of evidence relating to a sexual assault depicted in a scene in the movie, *The Girl With the Dragon Tattoo*, which appellant and the victim were watching at the time of the charged rape and sexual battery, and also to questions regarding the effect of the crimes on her military career.  Appellant also claims that he received ineffective assistance of counsel, and that the district attorney's closing arguments constituted prosecutorial misconduct.  Finally, appellant also claims, and the Attorney General agrees, that the abstract of judgment must be amended to conform to the trial judge's pronouncement of sentence.

**STATEMENT OF THE CASE**

On September 11, 2012, the Alameda County District Attorney filed an amended information charging appellant in count 1 with felony sexual battery by restraint (Pen.

1

Code, § 243.4, subd. (a)),[1] and in count 2 with forcible rape, a felony.  (§ 261, subd. (a)(2).)

Jury trial commenced on September 11, 2012.  On September 27, the jury returned verdicts finding appellant not guilty of felony sexual battery by restraint alleged in count 1, but guilty of the lesser offense of misdemeanor sexual battery and guilty of the forcible rape alleged in count 2.

At sentencing on April 13, 2013, the court denied appellant's motion for new trial.  As to the rape, appellant was sentenced to prison for the three-year low term.  With respect to the misdemeanor sexual battery, the court imposed the 230 days appellant had already served.

Timely notice of this appeal was filed on May 22, 2013.

## FACTS

The facts elicited at trial by the prosecution are as follows:  On Wednesday, July 20, 2011, appellant's sister, Victoria, who was a student at Laney College and is partially deaf, invited her two friends, Jane Doe[2] and Kimberly Garrette, to a sleepover at her home in Hayward.  Jane knew Victoria had a twin brother, appellant, and that he played football at Laney College; but Jane was older than appellant and did not socialize with him.  Victoria and appellant lived with their mother in a one-bedroom apartment.

While on the way to Hayward by bus, Garrette was called home by phone and got off the bus so she could return to Oakland.  When Jane and Victoria arrived at the latter's apartment, a little after 7:00 p.m., appellant was there but the twins' mother was not.

Jane, Victoria, and appellant ate pizza and watched a movie on TV in the living room.  The women sat on the couch and appellant sat on the floor.  The second movie they watched, which Jane selected, was the Swedish version of *The Girl With the Dragon Tattoo.*  Jane explained the "complicated plot" to the others and told them that the movie

---

[1]  All further unspecified statutory references are to the Penal Code.

[2]  During the entire trial, the victim was referred to only as Jane Doe.

2

contained a rape scene. Before that scene appeared, Victoria started falling asleep on the couch, so she went to the bedroom to sleep there more comfortably.

Jane and appellant continued watching *The Girl With the Dragon Tattoo*. Jane was wearing sweatpants, a sweater, and a T-shirt. She and appellant did not flirt in any way. After appellant got up off the floor and sat next to Jane on the couch, she moved to the floor, because "I didn't know this person all the way and I didn't want to, you now, give the wrong idea [like] 'I'm okay sitting on the couch with you.' " Asked what appellant's behavior was like, Jane answered "I would say he was kind of like how an 18- or 19-year-old boy acts . . . . Like obnoxious, always moving around, wouldn't sit down nowhere. Just kind of like an immature person."

Shortly after Victoria went to the bedroom, the rape scene in the movie appeared, in which the main character is "getting sodomized."[3] A moment later, appellant put his hands under Jane's arms and "scooped [her] off the ground" and carried her into the kitchen. Initially, Jane didn't feel threatened because she felt appellant was being playful. However, she became "alarmed" when appellant put his hands "near my genital area, inside my sweats." On cross-examination, Jane denied she went into the kitchen voluntarily in response to a request from appellant. When asked what she said when appellant touched the bottom part of her vagina, Jane responded, " 'What are you doing? Your sister is obviously in the house. Don't you have a girlfriend? What are you doing?' " Jane didn't call for help, she said, because she was "scared" and "confused." Appellant ignored her pleas and did not stop trying to get his hands into her pants. She felt incapable of freeing herself from his embrace because he was "pretty overpowering." She didn't cry out because "I was scared. . . . I wasn't thinking of screaming. I was just thinking I'm scared and I don't know what this person is capable of; he's bigger than me; if I run, is he going to chase after me; I can't get out the door fast enough; his sister might not believe me because it's still her brother." Appellant is about six feet three inches tall and weighs over 230 pounds. Jane is five feet three inches tall and weighs 122 pounds.

_____

[3] The trial testimony relating to this scene is described in greater detail and discussed, *post*, at pages 9-13.

While trying to prevent appellant from pulling off her pants, Jane fell to the ground, landing on her knees and then her stomach. At that point, she said, appellant "is now on top of my back, with his legs on either side of me." Appellant then pressed his elbow against her back while he put on a condom. Jane had not at this point said "no" to appellant, or demanded that he stop. But when he said: "Are you going to let me hit that," which she understood to mean "Are you going to let me have sexual intercourse with you." Jane replied: "No." She testified that she said " 'no' firmly," and did so "multiple times." "It wasn't playful; it wasn't any laughing. It was just 'no.' " Nevertheless, Jane testified, while appellant was pulling her pants down, she fell to the ground on her knees and then also her "stomach," at which time appellant was behind her. From that position he "insert[ed] his penis into my vagina" while repeatedly asking "[a]re you going to let me hit that?" and she repeatedly answers "no." He continued "thrusting" and penetrating her vagina while trying to get her up on her hands and knees. Eventually, after she gave up saying "no," appellant stopped and went into the bathroom.

Jane testified that the entire assault did not last very long, "[b]ut when it was happening, it seemed like forever." After appellant returned from the bathroom he made small talk about cars or wheel "rims."

Jane then went into the bathroom, where she saw a used condom in a trashcan. Jane sat down in the bath tub, because she was "scared" and thought this might prevent appellant from hearing a phone call she planned to make on her cell phone. She then phoned Kimberly Garrette and asked her to come get her. During the whispered conversation, Jane was crying softly and trying figure out how to escape. She didn't tell Garrette about the rape out of fear appellant was listening, and instead sent her several text messages "summarizing" the assault. Transcripts of the messages to Garrette were received in evidence and read to the jury. As Garrette was unable to come to appellant's house, Jane called another friend, DeAunTe White, who agreed to pick her up.

White testified that Jane called about 2:00 a.m., was "crying" and sounded "very distraught and afraid." White, and his friend Chris Wilson, arrived at appellant's apartment about 3:00 a.m. When White first saw Jane she was "crying hysterically" and

4

"trembling," and her clothing was "stretched out." According to Wilson, after the three drove to a nearby 7-Eleven and Jane described what happened, they advised her to go to the police. She refused because she "felt like she was having a bad dream." Jane testified that she "felt dirty" and "confused" and "didn't think like anyone would believe her." Also, Victoria was her best friend and she didn't want to hurt her, and also was not sure Victoria would believe her." White and Wilson then drove Jane to White's house, where she took a shower and went to sleep.

The next morning, White and Wilson took Jane to the police station. Jane made a tape recorded statement and then went to the hospital to undergo a sexual assault examination (SART). Jane's parents were with her at the time and she was crying.

At the request of the police, Jane made two phone calls to appellant to discuss what had happened at the apartment. The calls were recorded by the police, admitted into evidence and played for the jury. Appellant's recorded statements consist for the most part of repeated apologies; such as, "I apologize for the shit I was doing the night you was here. . . . I just really apologize. I didn't realize what I was doing. . . . I am so sorry." In response to Jane's statement that "you pretty much like raped me there," appellant responded: "Yeah, and I was like, I felt like shit . . . like and I really apologize and that's from the love of my heart . . . really." When Jane asked "did you even end up ejaculating inside of me," appellant answered affirmatively, adding "I'm sorry though. I really apologize." When she asked "why didn't you stop then . . . when we were in the kitchen and I was like 'no,' " appellant answered that "when you were saying no, . . . I didn't know it was like you was like . . . you know how people say no but its like (inaudible) 'no.' "

Victoria Johnson, appellant's sister, was called as a witness by the prosecution. She befriended Jane Doe, Kimberly Garrette, and DeAUnTe White in a dance class at Laney College; and Jane eventually became her "best friend." Victoria had introduced Jane and Kimberly to appellant prior to the incident, but they didn't "hang out" with him. After Jane and Victoria arrived at Victoria's home July 20th, and after a film appellant had been watching ended, she began watching *The Girl With the Dragon Tattoo* with

Jane and appellant, but fell asleep on the couch, apparently before the sexual assault scene in the movie. At some point she awoke, and got up and went to the bedroom to sleep there. Asked whether during the conversations she, Jane, and appellant had before she fell asleep, "was there any flirting going on," Victoria answered "no, ma'am." Victoria stated that at some point "early in the morning on July the 21st" Jane Doe woke her up and told her she was leaving, and said she would later explain why. Victoria heard nothing while she was asleep, and didn't recall asking her brother why Jane left after she awoke.

The next day, Victoria called Jane Doe but there was no answer. After hearing nothing from Jane, Victoria became "concerned." However, she was unable to recall whether she ever asked appellant anything about Jane's departure from the apartment, or whether he ever said anything to her about that.

In response to a series of questions by the prosecutor as to whether Officer Cassondra Huffman or any police officer had ever visited her at her house, or she had ever spoken with Officer Huffman or any other police officer, or whether she remembered "ever having signed forms saying that you were consenting to a search of your apartment, or whether she recalled "anything that happened on July the 22nd, 2011," or whether she could recall anything related to Jane Doe's departure from her apartment on the night of July 20 other than her unanswered telephone call to Jane on July 21, Victoria repeatedly stated that she was unable to recall.

After Victoria said she could not recall "ever having talked to anyone from the Hayward Police Department," the prosecutor asked Victoria " 'did you come to my office to talk to me last week?' " Victoria said she did. The prosecutor then asked whether she recalled that during that visit she listened to a taped statement she had given to the police at her house on July 22, and also recalled admitting that the statement she heard was hers. Victoria said she recalled going to the prosecutor's office but did not recall telling her that she had made the taped statement. With the approval of the court, the tape of the statement was played for the jury and transcripts of the statement were given to jurors.

After the tape was played, Victoria testified that she remembered making a statement to Officer Huffman the day after the night Jane Doe was at her apartment, and agreed that the tape the jury heard was of that conversation. Essentially, Victoria recalled she was "upset" about not hearing from Jane Doe and knowing what had happened. She did not question her brother but, according to the transcript of her statement, he came to her and said that "[h]e was acting stupid that day, and he was touching her, and she didn't want to be touched. Something like that he said . . . and I was just like " 'wow.' "

At the conclusion of Victoria Johnson's testimony, the People rested their case.

Kevin Craddock, the pastor of the church appellant's family attended, and also appellant's high school track and field coach, testified for the defense that appellant was "a nice young man" who had "always been respectful toward women." Pastor Craddock acknowledged that he had never seen appellant outside of an organized school or church activity.

Cheri Spigner, a friend of appellant's family, testified that appellant was always respectful to her two daughters who were about his age.

Officer Cassondra Huffman, who went with Jane to Highland Hospital for her SART exam, took the taped statement from Victoria Johnson, and arrested appellant, testified that appellant was always cooperative. Pursuant to a warrant, Huffman searched his residence and seized a used condom she found in a trash can in the bathroom. After the arrest, appellant waived his *Miranda* rights[4] and gave Huffman a statement which she tape-recorded.

Appellant, who testified in his own behalf at trial, denied raping Jane; he claimed she accompanied him to the kitchen willingly, where they engaged in mutual touching— she on his chest, he "on her butt"—and embraced. According to appellant, Jane "was just playing around"; "she was flirting with me and she was saying 'I'm going to tell your sister,' like 'I'm going to tell your sister.' She was rubbing on me. And then, I mean— she never told me 'Stop, I don't want to do this.' " According to appellant, the two then

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

7

walked back into the living room on their own and Jane "got on her knees" without him telling her to do so. Appellant then got down on his own hands and knees behind her and pulled Jane's pants down, to which Jane made no objection. Appellant then reached for a condom in a drawer at the end of the couch and put it on. At no point did Jane say anything like "no" or "stop" or "anything" that caused him "to believe she was not willing to do what you wanted to do with her."

It was only after he penetrated her that Jane indicated otherwise by saying "no." At first, appellant thought Jane just "playing around," but at some point he asked whether her suddenly saying "no" was "for real." This time Jane's "voice changed. And I was like, 'okay.' That's when I got off her." When asked whether he had ejaculated, appellant said he had not.

On cross-examination, the district attorney and appellant engaged in a colloquy relating to the sexual assault scene in the movie appellant and Jane were watching at the time the charged offenses took place. Over repeated objections based on relevancy, the prosecutor was allowed by the court to ask appellant if he recalled whether the female protagonist in the film was required to submit to any particular acts, or whether she or anyone else in the film was sodomized or otherwise sexually assaulted. Appellant was unable to recall seeing any such acts.

Additional facts relating to appellant's legal claims are later described and discussed in connection with those claims.

## DISCUSSION

Appellant's arguments are quinary: (1) that by overruling his objections to the prosecutor's questions regarding the sexual assault scene in the movie *The Girl With the Dragon Tattoo* the trial court abused its discretion; (2) the court similarly abused its discretion by overruling his objection to the prosecutors questions of Jane Doe regarding the effect of the sexual assault on her military career; (3) defense counsel rendered ineffective assistance of counsel by failing to move to strike Jane Doe's answers to the foregoing questions; (4) the portion of the prosecutor's closing argument related to the sexual assault scene in the film, and the effect of the crimes on Jane Doe's military

8

career, relied on facts not in evidence or misstatements of the evidence, which in either event constituted prosecutorial misconduct; and (5) the abstract of judgment must be amended to conform to the oral pronouncement of sentence by the trial judge.

Addressing the issues in turn, we reject all of appellant's claims save the last.

## I.

### *Overruling Appellant's Objections to Questions Pertaining to the Sexual Assault Scene in the Movie The Girl With the Dragon Tattoo Was Not an Abuse of Discretion*

Appellant is quite right, and it is axiomatic, that "[n]o evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "Evidence is relevant if it tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' (*People v. Garceau* (1993) 6 Cal.4th 140, 177, disapproved on other grounds in *People v. Yeoman* (2003) 31 Cal.4th 93, 117. The trial court has considerable discretion in determining the relevance of evidence ([*Garceau*]*,* at p. 177. . . .  The 'existence or nonexistence of a bias, interest, or other motive' on the part of a witness ordinarily is relevant to the truthfulness of the witness's testimony (Evid. Code, § 780, subd. (f)) . . . ." (*People v. Williams* (2008) 43 Cal.4th 584, 633-634.)

While a court has no discretion to admit irrelevant evidence (*People v. Turner* (1984) 37 Cal.3d 302, 321, overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1115), it possesses wide discretion to determine the relevance of proffered evidence. (*People v. Babbit* (1988) 45 Cal.3d 660, 681.)

The questioning of Jane Doe to which appellant principally objects took place after the district attorney asked Jane the name of the second movie she and appellant viewed together and Jane responded that it was *The Girl With the Dragon Tattoo* and she chose it because she had read the trilogy on which the film was based and had previously seen the movie. The following exchange then ensued:

"[Prosecutor]:  What is the movie about?

"[Jane Doe]: The movie is about a young woman named Elizabeth Salinger who is under the control by their government, so she doesn't have any rights or privileges to her own money, so she has to go to a guardian to call to get money for things, she can't support herself. So that's what it's about.

"[Prosecutor]: And is there an unusual relationship between she and her guardian in the movie?

"[Jane Doe]: Yes, ma'am.

"[Prosecutor]: And what is that?

"[Defense Counsel]: Objection. Irrelevant.

"THE COURT: Overruled [¶] You can answer the question . . . .

"[Jane Doe]: The relation—can you say again?

"[Prosecutor]: Yes . . . . [¶] . . . The relationship between she and her guardian, does it end up being violent at some point?

"[Jane Doe]: Yes, ma'am.

"[Prosecutor]: And what happens to the main character at the hands of the guardian?

"[Jane Doe]: At the hands of the guardian, the main character ends up having to perform oral sex at some point one time to receive money for just necessities; and the second time around she's assaulted.

"[Prosecutor]: Is that just a normal assault, or is it a sexual assault?

"[Jane Doe]: Sexual assault ma'am."

According to appellant, the foregoing questions by the prosecutor did not " ' " ' 'logically, naturally, and by reasonable inference' " ' " lead to any material fact in the case, nor make it any less plausible that Jane Doe did not consent. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1116-1117, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151; *People v. Scheid* (1997) 16 Cal.4th 1, 13; *People v. Kipp* (2001) 26 Cal.4th 1100, 1123-1124 for the proposition that "In a prosecution for forcible rape, evidence is relevant if it establishes any circumstance making the victim's consent to sexual intercourse less plausible.") As appellant sees it, the "only purpose" of the

10

prosecutor's questions "was to invite the jury to speculate that appellant raped Jane Doe in the same manner and to exercise control over her as the guardian did in the movie." (Citing *People v. De La Plane* (1979) 88 Cal.App.3d 223, 244, ["[s]peculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210"], disapproved on another ground in *People v. Green* (1980) 27 Cal.3d 1, 39, fn. 25.)  Appellant maintains that the movie cannot provide the basis for such a speculative inference because the aspects of the movie upon which the prosecutor focused have no "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)  According to appellant, such an inference is far too speculative to establish the requisite relevance.  We are not persuaded.

As appellant says, relevant evidence is that which has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)  The evidence regarding the scene in the movie is relevant if it tends " 'logically, naturally, and by reasonable inference' " to establish any material—i.e., disputed—fact. (*People v. Garceau*, *supra*, 6 Cal.4th at p. 177.)  "A 'material matter' is one 'the existence or nonexistence of which is provable in the action.' [Citation.]  In other words, materiality depends on the *issues in the case*; evidence which does not relate to a matter in issue is *immaterial*. [Citations.]"  (1 Witkin, Cal. Evidence (5th ed. 2012) § 3, p. 360.)

Appellant's defense is consent.  The evidence regarding the sexual assault scene in the movie relates to that material issue in two ways.

First, it establishes a motive.  "When the commission of a criminal *act* by a defendant is a disputed issue in the action, evidence that tends to prove that the defendant had a *motive* for committing the criminal *act* is deemed relevant evidence.  'Motive' is itself a state-of-mind or state-of-emotion fact.  Evidence that tends to prove 'motive' meets the test of relevancy by virtue of the circumstantial-evidence-reasoning process that accepts as valid the principle that one tends to act in conformity with his state of mind or emotion."  (*People v. De La Plane, supra*, 88 Cal.App.3d at p. 246, italics in

11

original.)  The fact that immediately before the acts at issue appellant had just watched a sexual assault may have had a bearing upon his state-of-mind or state-of-emotion; it provided circumstantial evidence from which it could reasonably be inferred that his act was stimulated by the scene in the movie, not because Jane voluntarily offered herself to him or consented to his advances.

The second and perhaps more significant way in which the evidence in question undermines appellant's consent defense is that it undermines his credibility.  As earlier described, appellant testified that Jane accompanied him to the kitchen willingly, where they engaged in mutual touching and flirtation and embraced, and then Jane returned to the living room and submissively got on her hands and knees without being told to do so, and made no objection when appellant pulled down her pants.  Appellant was unable to recall whether the girl in the movie he and Jane admittedly watched together was required to submit to any particular sex acts, or was "sodomized," as Jane said, or otherwise sexually assaulted.  Appellant's testimony suggests there was no connection between the movie and his state-of-mind or state-of-emotion, and the movie therefore had nothing to do with his act.  The questions asked of Jane and her responses thereto clearly challenged the credibility of appellant's testimony.[5]

Because the evidence sought and elicited by the questioning appellant objected to was relevant, appellant's objections thereto were properly overruled.

Finally, it bears mentioning that the scene in the movie at issue was never offered in evidence and seen by the jury.  From all that appears in the record, all the jury knew of

---

[5] In closing argument, which we discuss in greater detail, *post*, at pages 19 to 22, the prosecutor challenged appellant's credibility on the basis of his claimed inability to remember the "horrific sodomy scene" in the movie:  "He has no memory that the victim in that sodomy scene is face-down when this is happening.  He has no memory that [the protagonist in the movie is] being sexually assaulted.  That's a huge part of this movie.  A huge part of this movie.  But he gets on the stand and he has zero memory of that.  [¶]  I think that's telling."  The prosecutor also felt it "important to say that the victim during the course of this sexual assault in the living room is face-down just like the victim was in the movie."

the sexual assault scene or the plot of the movie derived from the testimony of Jane Doe earlier set forth, which was not inflammatory or otherwise unduly prejudicial.

## II.

### *Overruling Appellant's Objections to Questions About the Effect of the Crimes on the Victim's Military Career was Not Prejudicial*

At the end of the prosecutor's direct examination of Jane Doe she testified that shortly before the incident with appellant she had commenced the process of enlisting in the military and had started basic training. At that point, the prosecutor asked, "[a]nd was there anything about this experience [i.e., appellant's sexual assault] that affected what you wanted to do while you're in the armed services?" Defense counsel objected, stating: "irrelevant," and the trial court overruled the objection. The following colloquy thereupon took place between the prosecutor and Jane Doe:

"[Prosecutor]: And what is it you would like to do based on this experience?

"[Jane Doe]: Basically, based on this experience, right now I would like to be— I'm training right now to finish qualifying with my weapon and qualifying in combatives. [¶] . . . [¶]

"[Prosecutor]: Is what you would like to do in the military after basic training—is that as a result of this incident?

"[Jane Doe]: Yes, ma'am.

"[Prosecutor]: And what is it that you would like to do?

"[Jane Doe]: I would just like to help other people. That's being a chaplain's assistant. I'm going to be a spiritual person for people to come to talk with of anything they're going through. I want to be a person to let them know that it's going to be okay and you can do anything. Anything. It doesn't matter who tried. Nobody can stop you from anything. It doesn't matter what happened. You push forward and you move forward no matter what."

Appellant maintains that the affect of Jane Doe's "experience" on her plans for her military career is not relevant to any disputed or material issue in this case.

13

The People disagree. Relying on *People v. Scott* (2011) 52 Cal.4th 452, 493 ("a witness's 'demeanor is always relevant to credibility' ") and Evidence Code section 780, subdivision (a).[6] The Attorney General contends the prosecutor's questions were "relevant to her credibility and her testimony that she was raped. Jane's plan to become a military chaplain—in order to help others who survived traumatic experiences—was relevant to her demeanor on the stand, and thus to her credibility." The Attorney General's argument is supported neither by the case she relies upon nor reason.

*Scott* was a death penalty case involving not just first degree murder but numerous other crimes, including rape. Julia K., one of the rape victims, had given birth to a baby three days before her trial testimony, and discharged from the hospital only the night before. The prosecutor advised the trial court that Julia "was experiencing 'a lot of obvious discomfort' and might need 'frequent breaks.' The prosecutor wished to ask her certain leading questions to establish this, 'so that the jury would not think she . . . is maybe not being responsive to defense counsel or me . . . .' The prosecutor was permitted to ask four questions in this regard, and Julia answered 'yes' to each of them. (1) Did she have a baby three days ago? (2) Was she discharged from the hospital the previous night? (3) Was her baby still in the hospital? (4) Did she wish to 'just get this over with this morning . . . ?' " (*People v. Scott. Supra*, 52 Cal.4th at p. 493.) On appeal the defendant contended that the fact that Julia recently gave birth and her baby was still in the hospital " 'is of absolutely no relevance to any issue in the trial.' " The trial court disagreed. After observing that, pursuant to Evidence Code section 780, a witness's demeanor " 'is always relevant to credibility,' " the court observed that "absent an explanation of Julia's medical condition, the jury might have concluded that she was 'not being forthright or doesn't want to answer questions or is not able to.' " (*Scott*, at p. 493.) Additionally, at the conclusion of Julia K.'s testimony, the trial court instructed the

[6] As material, that provision declares that "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: (a) His demeanor while testifying and the manner in which he testifies."

jury as follows: " '[T]he court allowed the questions . . . concerning her giving birth to the child recently . . . so that you would be aware of her present physical and emotional condition as it may bear on her ability to testify, and that you should not consider those factors concerning the birth of the child for any purpose other than that and should not give any consideration as to either sympathy for or bias against either side.' " (*Ibid*.) The Supreme Court found no error.

*Scott* is manifestly inapposite. In the present case there was no danger that any medical or other condition of Jane Doe might misleadingly affect her demeanor in any way; nor was any admonition given in this case comparable to that given the jury in *Scott*, limiting the use by the jury of Jane's answers to the prosecutor's questions.

The effect of Jane's "experience" on her military career was simply not related to her "demeanor while testifying and the manner in which [s]he testifies." (Evid. Code § 780, subd. (a).) Nor was it relevant to any disputed issue in the case. Accordingly, appellant's objection to the prosecutor's questions regarding that matter should have been sustained and overruling it was error. Overruling the objection was error.

The remaining question, therefore, is whether the testimony in question was prejudicial under the test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, i.e., whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."

Appellant contends that it was, arguing that the evidence of guilt was not overwhelming, Jane Doe and appellant were the only witnesses to the offense, there was no physical evidence of forcible rape, and appellant could reasonably have believed Jane consented. He also emphasizes that the prosecutor relied on Jane Doe's testimony about the effect of the crimes on Jane's military career in her closing statement to the jury, in which she argued "that this experience has changed [Jane's] life significantly," and that her testimony was credible because "you don't change your life for a lie."

There is not a reasonable probability a more favorable verdict would have resulted if the testimony of Jane Doe at issue had not been allowed. To begin with, we do not agree this was a close case or that the trial was simply a credibility contest between

15

appellant and Jane Doe.  Unlike appellant's testimony, which was in significant ways almost entirely uncorroborated, Jane Doe's version of the events was in several significant ways corroborated by the testimony of others.  Three witnesses communicated with and/or saw Jane immediately after the incident.  Garrette read Jane's text message describing the assault, and both Wilson and White saw her crying hysterically and trembling when they picked her up at appellant's apartment shortly after the rape.  Additionally, appellant's sister, Victoria, and appellant himself, the only others in the apartment at the time of the offenses, confirmed significant portions of Jane's testimony about what took place before, during, and after the incident, including her testimony that she invariably said "no" to appellant's touching her at all times until she was no longer physically able to resist him.  Furthermore, appellant made significant admissions both in his statement to the police and in the two recorded pretext calls made to him by Jane Doe, in which, among other inculpatory statements, he admitted hearing and ignoring Jane Doe's repeated protestations:  "No."

Finally, the prosecutor did not in her opening and closing statements to the jury place particular weight on Jane Doe's testimony about the effect of the crimes on her military career and her plan to become a chaplain's assistant, as appellant claims.  The earlier quoted statements of counsel relied upon by appellant, which comprise little more than a single paragraph in opening and closing arguments that consume 32 pages of transcript, is all the district attorney had to say about this testimony.  Given the weight of the other, far more salient, evidence, it is highly *improbable* a result more favorable to appellant would have been reached if the testimony at issue had not been received by the court.[7]

---

[7] For the first time in this case, appellant also claims that the trial court rulings that allowed the prosecutor's questions regarding both the assault scene in the movie and the effect of Jane Doe's "experience" on her military career "renders the trial fundamentally unfair" within the meaning of *People v. Partida* (2005) 37 Cal.4th 428, 432; *Estelle v. Maguire* (1991) 502 U.S. 62, 70; *Dowling v. United States* (1990) 493 U.S. 342, 352; and *Spencer v. Texas* (1967) 385 U.S. 554, 564, and therefore denied appellant the due process of law mandated by the Fourteenth Amendment to the United

## III.

### *Defense Counsel Did Not Render Ineffective Assistance of Counsel*

The basis of appellant's ineffective assistance of counsel claim is the failure of defense counsel to move to strike Jane Doe's responses to the challenged questions of the prosecution previously discussed.  The claim need not detain us very long.

In order to establish ineffective assistance of counsel appellant must show not just that " 'the representation fell below an objective standard of reasonableness under prevailing professional norms,' " but as well that "prejudice resulted, 'i.e., that absent counsel's failings a more favorable result would have been probable.' "  (*People v. Welch* (1999) 20 Cal.4th 701, 751; *Strickland v. Washington* (1984) 466 U.S. 668, 686.)

We have already concluded that the trial court did not err in overruling appellant's objection to the prosecutor's questioning regarding the sexual assault scene in the movie *The Girl with the Dragon Tattoo*, because it sought to elicit relevant evidence.  A motion to strike that evidence would therefore clearly have been meritless.

We have also concluded that though the trial court erred in overruling appellant's objection to the prosecutor's questioning about the effect of Jane Doe's "experience" on her military career, the error was not prejudicial.  Therefore, while a motion to strike that testimony would have been meritorious, the result of the failure to make such a motion was not prejudicial; i.e., absent counsel's failing, a more favorable result would not have been probable.

For the foregoing reasons, appellant was not denied the effective assistance of counsel to which he has a right under the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution.

---

States Constitution.  Even indulging the dubious assumption that appellant has not waived this argument by failing to raise it below (see *People v. Farnum* (2002) 28 Cal.App.4th 107, 165), we find that appellant fails to establish a denial of due process.

## IV.

### *The Judgment Cannot be Reversed on the Basis of Prejudicial Prosecutorial Misconduct*

Appellant claims that "the prosecutor committed misconduct by arguing facts not in evidence in two ways:  that rape is an act of power and control and that the girl in the movie was sexually assaulted in the same manner as Jane Doe."  The foundation of this argument is the portion of the prosecutor's closing argument regarding the sexual assault scene in *The Girl with the Dragon Tattoo*, "both to impeach appellant's credibility and to imply that he raped Jane Doe in the same manner as depicted in the movie."  The challenged argument, a portion of which was previously quoted, is in its entirety as follows:

"Let's talk a little bit about the fact that they are watching the movie right before this happens.  Because I think that's an important fact.  Because people, a lot of people, would argue that rape is not really about sex; it's about power.  It's not really about just getting sexual gratification.  It's also about getting it while you're controlling someone that you're getting it from.

"And in this movie the victim [i.e. Jane Doe] is able to describe that there is a very violent sodomy and rape scene, but the defendant is on the stand and he can tell you that he remembers the main character in the movie and that she's trying to get stuff from other people, but he has no memory of this horrific sodomy scene.  He has no memory that the victim in that sodomy scene is face-down when this is happening.  He has no memory that she's being sexually assaulted.  That's a huge part of this movie.  A Huge part of this movie.  But he gets on the stand and he has a zero memory of that.

"I think that's very telling.  Because we saw from both the victim and Victoria that they both saw that movie, there was a scene in it, it was obviously a horrific scene and a graphic scene, and that the victim was talking them through the movie because she had read the book.  So I don't know that that's especially believable that that scene is just forgettable to the defendant."

18

Appellant challenges the foregoing statements on the grounds "that there was no evidence that rape is about power and control. Indeed, such evidence is generally the purview of an expert on rape trauma syndrome. [Citation.] Further, there was no evidence that the girl in the movie was sexually assaulted 'face-down' in the same position as Jane Doe. Jane Doe only testified that the movie depicted oral sex and a sexual assault involving sodomy, and that the sodomy scene occurred just before appellant picked her up. Lastly, the evidence was very clear that Victoria went to sleep before the sexual assault scene in the movie and never testified that this scene was 'horrific' or 'graphic.' [¶] In short, the prosecutor's reliance on facts not in evidence and misstatement of the evidence constituted misconduct under both the federal and state standards." (Citing *People v. Hill* (1998) 17 Cal.4th 800, 828-829, and *People v. Kirkes* (1952) 39 Cal.2d 719, 724.)

Mindful that this argument was never raised in the trial court, and may therefore be deemed forfeited (*People v. Dykes* (2009) 46 Cal.4th 731, 760), appellant maintains that defense counsel was prejudicially ineffective for failing to object to the prosecutor's misconduct. We cannot agree.

As previously pointed out, the prosecutor's statements focused primarily on the fact that appellant's "zero memory" of events most people would think unforgettable undermines his credibility; and it also relates to evidence from which it could reasonably be inferred that appellant's acts were stimulated by having just watched a sexual assault on film, not by Jane Doe's consent to his advances or their mutual "flirting." As we have said, because credibility and motive were both relevant factors, the prosecutor's argument was entirely appropriate.

The prosecutor's comment that "a lot of people" think rape is not just about sexual gratification but also power and control is conventionally accepted and was, in any case, a completely gratuitous remark that was almost certainly inconsequential, because it has little bearing on any material issue in this case, in which the chief issue is credibility.

Appellant's claim that there was no evidence the protagonist in *The Girl With the Dragon Tattoo* was assaulted from behind while "face-down," as was Jane Doe, is

19

quibbling. Appellant testified that as he and Jane Doe moved from the kitchen back into the living room, Jane "got on her knees" without him telling her to do so. Appellant stated that he then got down on his own hands and knees behind her and pulled Jane's pants down, to which Jane made no objection. This testimony strongly suggests that Jane was assaulted from behind, with her face toward the floor, as she also testified.

Appellant's complaint that the prosecutor misstated the evidence in saying that "the victim and Victoria both saw that movie," which contained "a horrific scene and a graphic scene," because Victoria went to sleep before the sexual assault scene and never testified that it was "horrific" or "graphic," is untenable. First of all, Victoria did testify that she "saw the movie." She did indicate that she left the room and went to sleep before the sexual assault scene, but the prosecutor never represented either that Victoria had witnessed the *sexual assault scene* or that she had characterized it as "horrific" or "graphic." In any case, whether Victoria saw the movie or the scene or characterized it in some way is not particularly pertinent to any material issue in the case, and therefore unlikely to have influenced the jury in any way.

Finally, the prosecutor's statements did not improperly "invite[] speculation that the violent sexual assault scene in the movie in some way gave appellant the idea to rape Jane Doe," as appellant claims. As earlier explained, "[i]n a prosecution for forcible rape, evidence is relevant if it establishes *any circumstance* making the victim's consent to sexual intercourse less plausible." (*People v. Kipp, supra,* 26 Cal.4th at pp. 1123-1124, italics added.) One of the circumstances making a rape victim's consent less plausible is a *motive* on the part of the defendant rendering consent irrelevant or significantly diminishing its importance; and, as we have said, evidence is admissible if it tends "logically, naturally, and by reasonable inference" to establish the defendant's motive. (*People v. Garceau, supra,* 6 Cal.4th at p. 177.) The inference that appellant was in some measure motivated to rape Jane Doe in a manner similar to that depicted in the sexual assault scene in a movie he had just finished watching is *not* entirely speculative, as appellant maintains. In our view, the inference has a "tendency in reason" to prove or disprove a disputed fact of consequence to the determination of this action.

20

(Evid. Code, § 210.)  Furthermore, as we have also explained, the challenged statement to the jury by the prosecutor related primarily to appellant's credibility, which was altogether proper.

For the foregoing reasons, and also because of a prosecutor's " 'wide latitude to vigorously argue his or her case and to make fair comment upon the evidence' " (*People v. Dykes, supra*, 46 Cal.4th at p. 768), we find that the statements to the jury by the district attorney that appellant challenges do not constitute prosecutorial misconduct, and any objection thereto would not likely have been sustained.  In other words, the record establishes neither prosecutorial misconduct nor ineffective assistance of counsel.

## V.

### *The Record Must be Amended to Correctly Reflect the Trial Court's Oral Pronouncement of Sentence*

The abstract of judgment indicates that the sentence imposed was based on the conviction of appellant for sexual battery, not rape.  Similarly, the court's minutes indicate appellant was convicted of "[c]ount 2:  A violation of Penal Code section 261(A)(2), Sexual battery, the low term, time imposed 3 years."

As the Attorney General agrees, the foregoing statements in the abstract of judgment are incorrect.  As to count 1, the jury returned verdicts of not guilty of felony sexual battery by restraint (§ 243.4, subd. (a)), and guilty of the lesser offense of misdemeanor sexual battery (§ 243.4, subd. (e)).  As to count 2, the jury returned a verdict of guilty of felony forcible rape (§ 261, subd. (a)(2)).  At sentencing, the trial judge stated:  "So as to count 1, which is the 243.4 misdemeanor, it would be credit for time served of 230 days, [¶] . . . [¶] *And as to [the rape charged in] count two, it would be the low term of three years*."  (Italics added.)

Where, as here, the record is in conflict " 'that part of the record will prevail which, because of its origin and nature or otherwise, is entitled to the greater credence.' " (*People v. Bankers Ins. Co.* (2010) 182 Cal.App.4th 582, 586.)  "The record of the oral pronouncement of the court controls over the clerk's minute order" (*People v. Farrell*

(2002) 28 Cal.4th 381, 384, fn. 2) and any discrepancy is deemed to be the result of clerical error. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

Pursuant to the authority granted us under section 1260, we shall order the abstract of judgment corrected.

## DISPOSITION

The cause is remanded to the trial court with directions to correct the abstract of judgment and minute order to conform to the trial court's oral judgment imposing the three-year term on the felony rape conviction alleged in count 2, with the sentence on the misdemeanor sexual battery conviction in count 1 deemed served. In all other respects, the judgment is affirmed.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Brick, J.*

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22