Filed 12/31/24  P. v. Ramos CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JENNIFER MENDOZA RAMOS,<br><br>    Defendant and Appellant. | D081526<br><br><br>(Super. Ct. No. SCN413172) |

APPEAL from a judgment of the Superior Court of San Diego County, Kelly Mok, Judge.  Affirmed as modified.

Gene D. Vorobyov, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Jennifer Mendoza Ramos appeals from a judgment of conviction for first degree murder.  She contends the trial court prejudicially erred when ruling on two motions in limine and committed sentencing error.  We reject both contentions, but we agree the judgment must be modified to correct a small number of typographical errors in the abstract of judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In a *Mirandized*[1] videotaped interview with Sheriff's deputies, Ramos admitted that, on April 10, 2020, she took a large kitchen knife from her apartment, walked a few blocks from her house, and started looking for someone to kill.  The first person she saw was Chad Danielson out walking his dog.  She approached him from behind, grabbed him in a "bear hug," and stabbed him in the chest.  Danielson tried to defend himself, but Ramos was able to stab him "again, and again, and again."  She stabbed him until she knew he would die from his wounds.  After she was certain he would die, she picked up the knife, ran home, and took a shower.  Danielson did in fact die from the seven stab wounds she inflicted to the front and back of his torso.

Ramos claimed the devil told her to kill the first person she saw that morning.  She had never met nor even seen Danielson before she killed him.  He had done nothing to her; she repeatedly described him as "an innocent."  She described her feelings afterward as "a little bit scared," but "[m]ostly just a rush."

On May 4, 2020, Ramos was charged with first degree murder (Pen. Code,[2] § 187).  The operative information alleged an enhancement for

---

[1]  *Miranda v. Arizona* (1966) 384 U.S. 436.

[2]  Further undesignated statutory references are to the Penal Code.

personal use of a deadly or dangerous weapon (§ 12022) and the special circumstance of lying in wait (§ 190.2, subd. (a)(15).

Ramos presented a mental health defense at trial. She retained a psychologist who diagnosed her with delusional disorder, cannabis use disorder, and amphetamine use disorder. According to the psychologist, "[t]he hallmark symptom of a delusional disorder" is a "fixed, unwavering belief about a person, a situation, a phenomenon that is not correct, but that is [also] not factual and not based in reality." Another "hallmark feature" of delusional disorder, however, is that, "aside from the delusions," a person diagnosed with the disorder is generally "not otherwise impaired."

The psychologist opined that Ramos had an ongoing delusional belief "that she is communicating with Jesus Christ and . . . with Satan." The expert, however, "had no current concerns" about Ramos's "everyday executive functioning" and "decision-making abilit[y]," including the ability to "self-regulate," "inhibit . . . impulsive responses," "initiate problem solving," and "plan and organize." He specifically agreed she was capable of engaging in "goal-directed behavior."

On September 20, 2022, a jury convicted Ramos of first degree murder, and found true the allegation she personally used a deadly and dangerous weapon. (§§ 187, subd. (a), 12022, subd. (b)(1).) The jury was unable to reach a verdict on the lying-in-wait special circumstance. (§ 190.2, subd. (a)(15).) On December 8, 2022, the trial court sentenced Ramos to prison for 25 years to life for murder plus a consecutive one-year term for the weapon use enhancement.

DISCUSSION

I.

*No Error Admitting Autopsy and Crime Scene Photographs*

Ramos contends the trial court prejudicially erred when it admitted into evidence (1) a photo of Danielson on the ground surrounded by rescue workers after he died, (2) nine photographs from Danielson's autopsy, and (3) a series of PowerPoint slides that showed the autopsy photos and related trial testimony about each stab wound to his body.  She contends this visual evidence—which shows the exact location where Danielson was killed and his injuries after he died—should have been excluded pursuant to Evidence Code section 352.  In Ramos's view, the evidence purportedly "had no probative value on any material disputed issues," and "[t]he only function of the blown-up autopsy photographs was to generate sympathy for [Danielson] and reinforce the sense of horror from this tragic incident while not adding to the jury deciding whether the killing was first or second[ ]degree murder or whether the lying-in-wait special circumstance was proven."  She claims the court's error under state law had the additional legal consequence of violating her federal due process rights.

Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice."  The question presented here is whether the trial court abused its discretion when it found the probative value of the autopsy and crime scene photos outweighed any potential prejudice.  (*People v. Scheid* (1997) 16 Cal.4th 1, 18 (*Scheid*).)  Applying this deferential standard, we find no error.

The probative value of the evidence was high.  (Evid. Code, § 352.)  As Ramos admits, the main issues in dispute at trial were (1) whether the killing was first or second degree murder, and (2) whether the lying-in-wait special circumstance allegation was true beyond a reasonable doubt.  To obtain a conviction for first degree murder as opposed to second degree murder, the People were required to prove the killing was "willful, deliberate, and premeditated."  (Pen. Code, § 189.)  To prove the lying-in-wait special circumstance, the People were required to prove (1) Ramos concealed her purpose from Danielson, (2) waited and watched for an opportunity to act, and (3) made a surprise attack on him from a position of advantage.  (Pen. Code, § 190.2, subd. (a)(15); *People v. Bonilla* (2007) 41 Cal.4th 313, 330.)

Here, the photo of Danielson's body with rescue workers right after he died showed the overall condition of his body after the attack and its relative position at the crime scene.  The nine autopsy photos showed the exact location and depth of the stab wounds.  Together, the photos provided strong support for the prosecution's theory that Ramos planned and deliberated a surprise attack on Danielson.  The photos corroborated her confession she snuck up on him from behind, placed him in a "bear hug," and stabbed him in the chest before he could try to defend himself.  They showed she was able to overpower him and forcefully stab him a total of seven times all over his torso despite the fact she was out of shape, and he was a physical education instructor.  Jurors could infer from this visual evidence that Ramos engaged in planning activity before the murder and deliberately and strategically placed herself in a position where she could quickly and suddenly surprise Danielson and overcome him with deep, lethal blows before he could successfully defend himself.

The evidence was also highly probative on the question of Ramos's mental health defense. During her interview with Sheriff's deputies, Ramos seemed to have a clear memory of the entire attack. She not only provided a detailed description of the murder, including that she inflicted six to eight stab wounds, she actually *acted out the murder* while she was being videotaped and showed the detective exactly how she remembered stabbing Danielson. A visual comparison between Ramos's videotaped reenactment and the autopsy pictures of the seven stab wounds that were inflicted during the actual attack would certainly have been probative on the question of the accuracy of Ramos's memory and whether her ability to premeditate and deliberate was affected by her mental illness. To the extent the location and nature of the stab wounds aligned with her memory, that alignment would have been strongly supportive of the prosecutor's theory she was not so out of her senses at the time of the murder to be unable to premeditate and deliberate or plan a surprise attack. We conclude the evidence had obvious and significant value.

Ramos argues the evidence nevertheless lacked probative value in the sense that it was purportedly cumulative. She contends the forensic pathologist's verbal testimony about the injuries at trial "aptly covered [the] issue" as it "went on for 20 pages" in the reporter's transcript. We strongly disagree. "Seeing is believing," as the saying goes. Prosecutors are not required to prove details about the fact or manner of death solely from the testimony of live witnesses in lieu of photographic evidence. (*Scheid, supra*, 16 Cal.4th at p. 16.) The jury here was "entitled to see how the physical details of the scene and body supported the prosecution theory." (*People v. Turner* (1990) 50 Cal.3d 668, 706.) In particular, the forensic pathologist opined that Danielson's wounds were consistent with "the person who

6

inflicted [them] walk[ing] up from behind and reach[ing] around [Danielson's] body and making stabbing wounds backwards." "Because the photographic evidence [of the victim's wounds] could have assisted the jury in understanding and evaluating the testimony presented to them, the trial court's determination that such evidence had sufficient probative value to warrant its admission was not erroneous" on the ground it was "merely cumulative." (See *People v Wilson* (1992) 3 Cal.4th 926, 938.) The jury was thus entitled to see the autopsy photos that provided the foundational evidence for the pathologist's opinion.

Ramos claims the evidence should have been excluded because of a purported "defense stipulation" that Ramos killed Danielson by stabbing him multiple times. We observe no support in the record for this contention. A concession at closing argument, conducted after the close of evidence—which is what we have here—is not a stipulation. Regardless, "[t]he general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1007.)

Ramos, moreover, misses the point here. It is true the parties did not dispute the "cause of death." It was essentially uncontested Danielson died from seven stab wounds. But the crime scene and autopsy photos were relevant to prove more than the manner of *death*. The evidence was relevant to prove the manner of *attack*. Ramos concedes this was the critical dispute at trial. As we have explained, the crime scene and autopsy photos were highly probative on the question of whether the attack was premeditated and deliberated and/or undertaken by surprise from a position of advantage.

7

Finally, the evidence was not unduly prejudicial.  (Evid. Code, § 352.) "[V]ictim photographs and other graphic items of evidence in murder cases always are disturbing."  (*Scheid, supra,* 16 Cal.4th at p. 19.)  The trial court here made a point of winnowing the photos down from more than 100 to nine. The court allowed only one photo showing the body at the scene of the crime. The court eliminated duplicates of the autopsy photos and allowed only one that showed blood from the injuries before the body was cleaned off.  And all of the photos in the PowerPoint presentation were ones that had otherwise been admitted at trial.  We have independently reviewed all of these exhibits. In our view, the evidence tended to prove the mental state elements of first degree murder and the lying-in-wait special circumstance in a way that was not "gratuitously inflammatory."  (*People v. Osband* (1996) 13 Cal.4th 622, 678.)  We find no abuse of discretion.[3]

## II.

### *Harmless Error to Admit Victim's Photograph*

Ramos contends the trial court abused its discretion and violated her federal due process rights when it admitted a sentimental family photograph of the victim, his wife, and their two dogs.  Our high court has "repeatedly cautioned against the admission of photographs of murder victims while alive unless the prosecution can establish the relevance of such items."  (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1230 (*DeSantis*).)  We conclude any error was harmless.

---

[3]    Because we find no state evidentiary error, we necessarily find the trial court's ruling did not have the additional legal consequence of violating Ramos's federal due process rights.  (See *People v. Partida* (2005) 37 Cal.4th 428, 438–439 (*Partida*).)

Ramos sought in limine to exclude an "inflammatory" photograph of Danielson pursuant to Evidence Code section 352. The photograph in question shows Danielson and his wife smiling together while holding their two dogs. The trial court found the photograph probative on the issue of Danielson's height, weight, and physical build during the incident, and because it showed the dog he was walking when he was attacked.

We agree that Danielson's level of physical fitness was relevant to Ramos's ability to fight with him and could potentially support the inference she deliberately decided she needed to approach him from behind by surprise to kill him. But we do not agree the photograph is probative on this question. Danielson is pictured from the side. His chest is entirely obscured because he is holding his dog. His body is covered by loose clothing with the exception of his elbow, forearm, and a small portion of the back of his calf. His height is not discernable, because most of the lower half of his body is not within the frame of the photograph. Nor is his height discernable in comparison to his wife in the picture. The couple does not appear side by side and the lower half of her body is also not within the photograph's frame.

We conclude the photograph's only probative value is that one of the dogs in the picture is the one Danielson was walking when he was killed. This value is de minimus, however, given the small dog did not engage with Ramos during the attack. On the other hand, as noted, the photograph is a touching and sentimental one. We therefore agree with Ramos that, balanced against its minimal probative value, it was unduly prejudicial. (Evid. Code, § 352.)

We do not agree, however, the error was so serious as to violate due process. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally*

9

*unfair.*" (*Partida, supra*, 37 Cal.4th at p. 439.) The addition of a single photograph showing the couple when Danielson was alive did not render the trial fundamentally unfair. This is especially true here, given the jury was destined to encounter Danielson's wife and hear her testimony about her relationship with him. She was a percipient witness who saw the latter part of the murder. She gave gut-wrenching testimony about seeing her husband murdered before her eyes. The addition of a single, sentimental photograph to testimony that was already unavoidably heart-wrenching did not render the trial fundamentally unfair. (*DeSantis, supra,* 2 Cal.4th at p. 1231 [concluding there was no "diminution" in "the reliability of the guilt determination" despite the possibility a photograph "creat[ed] sympathy for the victims"].)

We hold the error was harmless under any standard for assessing prejudice. (*Chapman v. California* (1967) 386 U.S. 18; *People v. Watson* (1956) 46 Cal.2d 818.) This was not a close case in which the jury's sympathy for the victim could potentially lead it to improperly convict Ramos of first degree murder as opposed to second degree murder. The evidence of premeditation and deliberation was overwhelming, and it came in the form of Ramos's own words during her videotaped interview.

Before leaving her house, Ramos thought about whether she should use the knife she kept in her room or a "smaller one." She decided the knife in her room was "the perfect one to do it with," because the victim "had to die." After going outside, she decided to walk a few blocks away from her neighborhood to avoid killing anyone she grew up with. During her videotaped interview, she admitted she knew right from wrong and that it was a choice to kill Danielson. As she was stabbing Danielson, she had a moment of self-doubt, but "thought to [her]self," "he has to die," so she "kept

10

stabbing him" until she was certain he would in fact die. She described stabbing Danielson and only stopping when she knew he was dying. After the attack, she had the presence of mind to pick up the knife from the ground before she left, she hid from Sheriff's deputies when she heard sirens because otherwise she "might get locked up," and she immediately changed out of her clothes and showered when she got home because "they were bloody." Her own expert agreed she was capable of engaging in "goal-directed behavior" and had "no current concerns" about her "everyday executive functioning" and "decision-making abilities," including the ability to "self-regulate," "inhibit the impulsive responses," "initiate problem solving," and "plan and organize."

This is not a close case where sympathy for the victim could have led a jury to improperly convict a person of first degree murder instead of second degree murder. The admission of the photograph was harmless under either *Chapman* or *Watson*.

## III.

### *No Sentencing Error*

Ramos contends the trial court abused its discretion when it declined to dismiss the one-year weapon enhancement for personal use of a deadly weapon pursuant to section 1385. We reject her contention because it is based on an unfair reading of the record. In doing so, we exercise our discretion to entertain Ramos's argument on appeal despite her failure to object below. (*People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6.) We do this because the Legislature made changes to section 1385 the year Ramos was sentenced. Those changes led to a conflict in the Courts of Appeal over the proper manner for exercising discretion pursuant to section 1385, and the

11

conflict was only recently resolved by the California Supreme Court. (*People v. Walker* (2024) 16 Cal.5th 1024, 1028 (*Walker*).)

As noted, the jury found true the sentence enhancement allegation that Ramos personally used a knife in violation of section 12022, subdivision (b)(1). At sentencing, the trial court considered whether to dismiss the enhancement in the interest of justice pursuant to section 1385 and made four relevant findings. The court found (1) "th[e] crime was connected to mental illness," (2) "[Ramos's] prior performance on probation has been poor," (3) her adult convictions were "increasing in seriousness," and (4) she is a "*serious danger to the community*." (Italics added.) The court then stated, "Having [weighed] the aggravating factors along with the mitigating factor, the [c]ourt finds that it is not in the furtherance of justice to strike the enhancement, and I am going to impose the additional one year for the personal use of a deadly weapon."

The California Supreme Court recently explained how the weighing process works under section 1385 when there is no finding that dismissal of an enhancement will endanger public safety. "[I]f the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*Walker, supra,* 16 Cal.5th at p. 1029.)[4]

---

[4]     *Walker* was decided after the opening brief was filed and forecloses Ramos's main arguments in the opening brief. We address the arguments she continues to assert in the reply brief.

Relying on this authority, Ramos claims the trial court was required to give "great weight" to the mitigating circumstance that the crime was connected to mental illness, because it purportedly made no "danger to public safety" finding under section 1385, subdivision (c)(2). Her contention is unfounded. The trial court here specifically found Ramos is a "serious danger to the community." The court, as a result, was not required to give great weight to mitigating circumstances when considering whether to dismiss the enhancement. (*Walker, supra*, 16 Cal.5th at p. 1036.) As the high court said, in most cases, " 'if the trial court finds that dismissal of an enhancement would endanger public safety, then it is hard to see how dismissal would further the interests of justice,' notwithstanding the applicability of any mitigating factors[.]" (*Id.* at p. 1033.) The court therefore did not abuse its discretion when it declined to dismiss the enhancement.

Ramos contends the trial court's finding she "is a serious danger to the community" is not supported by substantial evidence, because she is serving an indeterminate sentence and cannot be released "until a parole board decide[s] that her release would not endanger the community." She asserts, "[t]here is no rational theory under which striking the one-year enhancement, which does not impact the 25-to-life sentence, would endanger [the] physical safety of any person, considering that when [she] gets out is up to the parole board." According to Ramos, "[s]triking of the enhancement could advance a parole hearing date, but it would not undermine the indeterminate nature of [her] sentence unless, after [she] serves the statutorily prescribed minimum term, the [parole board] finds that her release does not endanger public safety."

Ramos's argument is untenable. By her logic, considerations of public safety would never apply to defendants serving indeterminate sentences,

13

because the defendants' release in such situations will always be subject to parole board review. As a result, by her logic, public safety considerations would apply to defendants serving determinate sentences only. But the plain language of section 1385 does not make such a novel distinction. Absent express language limiting the public safety inquiry to determinate sentences, we do not believe the Legislature intended to treat defendants with indeterminate sentences more favorably than those with determinate sentences when considering whether to dismiss an enhancement. Our interpretation of the statute is consistent with the statutory scheme as a whole. When an indeterminate sentence is imposed, the assessment of whether a risk to public safety is expected to diminish by the time the base term is served—or whether the addition of more time pursuant to the enhancement is needed before the risk abates—ensures parole hearings are not conducted until there is a baseline possibility that a prisoner is no longer a public safety threat. Finally, Ramos appears to claim the record lacks substantial evidence she is a danger to public safety. She claims the trial court would have been "hard-pressed" to find dismissal of the enhancement "would result in physical injury or other serious danger to others" as required by section 1385, subdivision (c)(2). "A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998.) Here, however, overwhelming evidence supported the court's conclusion Ramos is a threat to public safety. As the court pointed out, the crime was "a cold, violent, premeditated killing of a complete stranger that was just out walking his dog." Ramos admitted she felt a "rush" after the murder. And Ramos specifically told the detective who interviewed her that she plans to kill again: "[H]e's not the first one I'm going to kill, let me tell you that, because

14

I'm the devil reincarnated and you guys know I am." We uphold the trial court's ruling.

## IV.

*Typographical Errors in Abstract of Judgment*

Finally, both parties agree the abstract of judgment does not reflect the court's oral pronouncement that "[a]ll fines and fees" were stayed. We agree as well and we modify the judgment accordingly. The court is directed to correct the abstract of judgment to reflect its oral pronouncement. Where there is a discrepancy between the oral pronouncement of judgment and a minute order or the abstract of judgment, the oral pronouncement controls.[5] (*People v. Farrell* (2002) 28 Cal.4th 381, 384, fn. 2.)

## DISPOSITION

The judgment is modified to reflect the restitution fine of $300, the court security fee of $40, and the criminal conviction assessment fee of $30 were stayed. As modified, the judgment is affirmed. The trial court is directed to forward an amended abstract of judgment reflecting the

---

[5] The minute order correctly states "[a]ll fines and fees are stayed."

modifications to the Department of Corrections and Rehabilitation.  The judgment is affirmed in all other respects.


DO, J.

WE CONCUR:


DATO, Acting P. J.


RUBIN, J.